### Peleg Wilbur, appellant, *v.* Samson Almy.

Where there were two trustees of the property of insolvents, and one of them made an assignment, but the other neither joined in it nor assented to it afterwards, the assignment was void.

And in the present case, also, the assignee appears to have received an assignment of the property only as security, until its profits should pay a debt due to him by the insolvents. That debt being extinguished, he has no right, as owner, to claim an account of further profits from the holder of the property.

This was an appeal from the Circuit Court of the United States for the District of Rhode Island, sitting as a court of equity.

The facts in the case are stated in the opinion of the court, to which the reader is referred.

It was argued by *Mr. Rockwell* and *Mr. Johnson* for the appellant, and *Mr. Bradley* for the appellee. The following are the points made by the counsel respectively, upon each of which numerous references were made to the evidence in the record.

Points by the counsel for the appellant.

I. The assignment to the plaintiff, Almy, was void. Charles Low and Thomas R. Hazard were the assignees of R. G. Hazard & Co., and the conveyance to Almy was made by R. G. Hazard and R. G. Hazard & Co., and assented to by Thomas R. Hazard alone, but was never authorized nor assented to by Charles Low, the other assignee. 2 Story's Eq. Dig. 521, § 1280; *Ex parte* Rigby, 19 Ves. 463; 1 P. Wms. 241; 3 Atk. 584; Lewin on Trusts, 265; 1 Cruise's Dig. 455; Sinclair *v.* Jackson, 8 Cow. 543, 553 – 554, 582 – 584.

II. The assignment to the plaintiff, Almy, of 9th March,

Wilbur v. Almy.

1830, was not an absolute assignment, either of the contract or of the interest of the parties in the machinery. It was a conditional assignment to secure a debt, which debt has since been paid.

III. Messrs. Low and Fenner owned one half of the contract of R. G. Hazard & Co., with Lippitt, and of the interest in the machinery; and as R. G. Hazard & Co. owned only the one half, neither Almy nor their assignees could convey more than that half.

The record in the case of Hunt & Fenner v. Hazard & Co., furnishes conclusive evidence that Low & Fenner paid for, and owned, one half of the contract and machinery.

The record, in that case, to show the fact of the payment, and the application of the amount, is clearly admissible and conclusive. 1 Stark. Ev. 183, § 57, 188, § 58, 189; Green v. New River Company, 4 T. R. 590; Floyd v. Brown, 1 Rawle, Rep. 121; March v. Pier, 4 Rawle, 273, 285; 4 Cow. & Phil. Ev. 1281, n. b.; Adams v. Broughton, 2 Str. 1078; Curtis v. Grant, 6 Johns. 168; Livingston v. Bishop, 1 Johns. 290; Farwell v. Hilliard, 3 N. H. Rep. 318; Gilmore v. Carr, 2 Mass. 171; Ward v. Johnson, 13 Mass. 148; Lechmere v. Fletcher & Co., 1 C. & M. 623, 634, 635; 1 Greenl. Ev. 631, § 527; 2 Phil. Ev. 3.

The fact that Low & Fenner owned one half of the contract and machinery, is also shown by the testimony of a number of witnesses.

The plaintiff, therefore, receiving from the assignee of Hazard & Co. only one half of the machinery, and not being authorized, or purporting to act for Low & Fenner, could not, in any event, recover more than one half of the value of it.

"A part owner, who sues alone, is entitled to recover, unless the defendant plead in abatement; but he cannot recover more than the value of his own share." 3 Stark. Ev. 1165; 2 Phil. Ev. ch. 15; 4 Cow. & Phil. Ev. 229; Brown v. Hodges, 1 Salk. 290; 2 Wms. Saunders, (ed. 1825,) p. 136; Addison v. Overend, 6 T. R. 766, 770; 7 T. R. 279; Wheelwright v. Depeyster, 1 Johns. 472, 485; Brotherson et al. v. Hodges et al. 6 Johns. 108; Bradish v. Schenck, 8 Johns. 151; Rich v. Penfield, 1 Wend. 380; Gilbert v. Dickinson, 7 Wend. 449.

IV. R. G. Hazard & Co., and S. Almy, their successor under the contract with Lippitt, have received the entire amount of the cost of the machinery, either from Low & Fenner or Lippitt; and neither of them, when this suit was brought, had any interest in it.

V. The course pursued by the plaintiff not only shows that he considered himself as having no further interest in the ma-

chinery or contract, but precludes him from setting up such interest, if he had any.

1. He concealed from Christopher Lippitt the execution of the agreement between himself and Hazard & Co., although he wrote to Lippitt the day after the execution of the agreement, and although he had agreed to act as his agent and friend.

2. After the execution of the contract, he declares that he is using the machinery to secure a debt, and when he ceases to supply cotton to the mill, states that his debt is paid, and claims no interest in, or lien on, the machinery; and from that time, September 11, 1832, to 1836, he never sees the machinery, or goes near the mill, nor communicates with Lippitt or any one else, nor ever claims to be the owner of it, or to have any interest in it.

3. Although the machinery was conveyed by Lippitt to Wilbur and the other mortgagees, on the 8th December, 1835, he makes no claim of any kind in relation to it, until the 15th October, 1836, more than ten months, when Hazard professes to make a claim in his behalf. November 25, 1836, he makes a demand for the machinery; and from that time to October, 1840, nearly four years, says and does nothing on the subject. He then writes a short letter, and refers the defendant to Hazard, and two years after files his bill.

Under these circumstances it operates as a fraud for the plaintiff to set up a claim to the ownership of this machinery; he has estopped himself, by his acts and declarations, from so doing. Packard v. Sears, 6 Adol. & Ellis, 475, (33 E. C. L. 117); Gregg v. Wells, 10 Adol. & Ellis, 90 (37 E. C. L.); Bushnell v. Church, 15 Conn. 54, 406, 419, 420; Roe v. Jerome, 18 Conn. 153.

VI. The contract between Lippitt and R. G. Hazard & Co., which, it is claimed, created a lien on the machinery, never having been recorded, does not, according to the laws of Connecticut, give title to the machinery against a *bonâ fide* purchaser, mortgagee, or attaching creditor, the machinery having remained in the possession of Lippitt, and treated as his own during the time. Swift v. Thompson, 9 Conn. 72; Mills v. Camp, 14 Conn. 225; Kirtland v. Snow, 20 Conn. 23; Patten v. Smith, 4 Conn. 450; Tobey v. Reed, 9 Conn. 216; Talcott v. Wilcox et al. 9 Conn. 134; Pettibone v. Stevens et al. 15 Conn. 19.

1. The mortgage was made to secure several distinct, independent debts of a number of creditors residing in different places, having no connection with each other; and there is no claim in the bill, or proof, tending to show that any, except Peleg Wilbur and C. H. Lippitt, had any knowledge of the existence of any contract between Hazard & Co., and Lippitt, con-

cerning the machinery, or are in any manner chargeable with notice.

2. The defendant, Wilbur, had not any notice of there being any lien on the property when it was mortgaged to himself and other creditors. He positively denies in his answer any notice of the existence of any lien. He was aware of the existence of a contract for manufacturing, and that Hazard & Co., made advances to Lippitt.

3. Even if the defendant, Wilbur, having notice of the existence of a contract between Hazard & Co., and Lippitt, were chargeable with notice of the terms of the agreement, and of the lien of Hazard & Co. on the machinery, by the law of Connecticut, under the circumstances of the case, his rights as mortgagee are not affected thereby. Swift *v.* Thompson, 9 Conn. 63, and other cases above cited.

VII. In the month of March, 1836, Christopher Lippitt made an assignment, under the insolvent laws of Connecticut, of his interest in the machinery to commissioners; and on the 15th October, 1836, they sold the equity of redemption in this machinery to John W. Fanning, the purchaser of the equity of redemption in the real estate. This conveyance was a valid one, and conveyed the property, subject only to the mortgages which were recorded, and was not subject any secret lien of Almy on the machinery. Swift *v.* Thompson, 9 Conn. 63.

VIII. This machinery, subsequently to the mortgage to Wilbur and others, was attached by other creditors of Lippitt, and the suits prosecuted to judgment. This attachment constituted a lien on this property, which would not be affected by any prior lien unrecorded. Neither did those creditors have any notice of any lien by Hazard or Almy.

IX. R. G. Hazard & Co., failed to perform their contract with Lippitt. They assigned the contract, and their assignee refused to furnish cotton and continue it.

This contract was an advantageous one to Lippitt to a far greater amount than the balance claimed to be due to R. G. Hazard & C., or Almy, under it.

X. The demand by Bailey, on behalf of Almy, of the 25th November, 1836, is not evidence of a conversion by Wilbur, even if he were not entitled to hold the property as security for his own debt.

1. Because he was bound to hold the property until the *bona fide* creditors, secured by mortgage without notice, had received the amount of their debts as above stated.

2. Because the commissioners, under the insolvent laws of Connecticut, had received a valid conveyance of the machinery, not subject to any lien by Almy.

3. Because the property was at the time under attachment on behalf of *bonâ fide* creditors, who subsequently obtained judgments on their claims; and the property so attached was receipted to the officer by Wilbur himself.

4. At the time when the demand was made, the machinery was not in the possession of Wilbur. While Lippitt was in possession for Wilbur and other mortgagees, (27th October, 1836,) he executed an agreement with John W. Fanning, by which he surrendered the mill and machinery to Fanning, and took a lease from him. The possession of Lippitt was thus the possession of Fanning.

There is no allegation in the bill that Wilbur was ever in the possession of the machinery. The 6th interrogatory in the bill is, " whether said Peleg Wilbur does not claim to be the owner of the said property, or did not, on the 25th day of November, 1836 ; and if said Wilbur had sold or conveyed the same, when, to whom, and for how much."

XI. The statute of limitation furnishes a complete bar to this action.

" The statute of limitation is applied by courts of equity in all cases when at law it might be pleaded." Coulson *v.* Walton et al. 9 Pet. 62, 82.

The mortgage of Wilbur and others was dated December 8, 1835 ; the bill was filed October 17, 1842.

1. The cause of action arose when Wilbur took possession of the property on the 8th December, 1835, and the statute then begins to run. He then took possession for himself and his co-mortgagees, and claimed to hold it adversely, denying the right of all others to the possession. Murray *v.* Burling, 10 Johns. 172 ; Bristol *v.* Burt, 7 Johns. 254 ; Reynolds *v.* Shuler, 5 Cow. 323 ; Hyde *v.* Noble, 13 N. H. Rep. 494.

2. If it did not commence at that time, it certainly did on the 15th October, 1836, when Hazard, at the time of the sale of the commissioners, publicly, and in the presence of Wilbur, as the agent of Almy, declared that Almy was entitled to the property under a prior lien.

3. If these did not constitute a conversion, there is no evidence of conversion furnished by the demand and refusal of the 25th November, 1836, for the reasons before stated.

The demand and refusal furnish no evidence of a conversion, if at the time Wilbur had not possession, or if he had not the right to relinquish it; nor if the person for whom the demand was made had no right to the possession at the time. If, therefore, a demand and refusal were *necessary* as the *only* evidence of a conversion, the action cannot be sustained.

XII. There was complete and adequate remedy at law.

The 16th section of the Judiciary Act (1 Stat. at Large, 82,) provides, "that suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy may be had at law."

If the plaintiff has any claims at all, he could have enforced them, as the assignee of the mortgage and machinery, by an action of trover. Montgomery v. Kerr, 1 Hill, S. C. Rep. 291; Langdon v. Buel, 9 Wend. 80; Oliver's executors v. Palmer & Hamilton, 11 Gill & Johns. 426.

XIII. If Wilbur is liable at all, he cannot be subject beyond the amount received by him, of $407, or, at the most, for the proportional amount which that sum bore to the entire amount received by the creditors under the mortgage, and if Low and Fenner owned one half the machinery, to only one half the amount.

The points raised by the counsel for the appellee were as follows:

I. The facts in this case give jurisdiction in equity.

1. The remedy at law was not plain, adequate and complete.

2. An account was necessary.

The ascertainment of damages involved necessarily the transactions between Lippitt and Hazard & Co.; and Lippitt and complainant; and Lippitt and defendant with Hazard and Co., and with complainant, respectively.

3. If the complainant is to be considered in equity as a mortgagee or assignee of a mortgagee, equity alone had jurisdiction to enable the mortgagor or his assignee to redeem or to foreclose the mortgage.

4. If Almy had a lien on the property, a court of equity was the proper forum to give him relief.

II. What is the true construction of the contract between Lippitt and Hazard & Co.?

1. Is it a mortgage in the true meaning of that term?

The essential characteristics of a mortgage are a debt or duty, and an obligation to repay the debt or perform the duty secured by a conveyance or assignment of some valuable thing. The form is immaterial, but the obligation must clearly appear. Here there is no obligation. A right or privilege is given, but there is no corresponding duty to take the property and pay.

The Hazards were the purchasers, took the bills in their own names, and were necessarily the general owners. He who pays the money is the general owner, no matter in whose name the conveyance is made. 2 Story Eq. § 1201, and notes.

Even if the bills had been in the name of Lippitt, it would have made no difference. 1 Hill. Ab. 307, § 12 – 28, 382, § 42. It was not a joint purchase.

16*

2. How did the parties themselves understand it? This is admissible evidence. 1 Hill. Ab. 273, 274. Neither of the parties treated Lippitt individually as debtor.

See R. G. Hazard, dep. 56. "His understanding at the time of the contract was that R. G. Hazard & Co. were to be absolute owners of the machinery, but C. Lippitt had a right to become the owner and to require a title from R. G. H. & Co. on performing certain conditions." Again, in 1830, when he was proposing to sell to Lippitt, he says: "I reminded him of his obligation under the contract to buy at a certain price. He argued that machinery was then low, and he would give me as much for it as it was then worth." Again, "I afterwards told Lippitt he must regard S. Almy as the owner."

So as to Lippitt, &c., in 1828 he insured $6,000 on the machinery belonging to R. G. Hazard & Co., and in 1829, to Hazard's assignees. In his application for insurance he says "the buildings and fixtures belong to me, and the machinery to R. G. Hazard & Co." In his own deposition he says "the assignees of R. G. Hazard & Co. proposed to sell me the interest they had in the machinery." In his letters to Almy he proposes to Almy to buy it from the assignees, by which he would save some $3,000, or to assist him in purchasing.

He had the privilege of becoming the owner, but was not bound to exercise it.

The case of Conway's Executor v. Alexander, 7 Cranch, 218, 237, and 8, 9, is in point both as to the general principle and the admissibility of extrinsic circumstances to determine whether it was a mortgage or not. It was not a mortgage in the ordinary meaning of that term.

III. It was a contract for a special and limited partnership, by which the ownership of the machinery remained in the Hazards until it should be paid for out of half the earnings of the factory, or in some other mode appointed in the contract.

1. It is an executory contract.

2. A contract for the employment of capital put in by either party, for the service of both parties, and for a division between the parties of the profits to be made out of such capital and services.

Lippitt gives the use of his mill, water privilege, &c.

Hazard, the use of the machinery.

Both, their services.

3. To the world they were partners, and the property used in the business was liable; with each other it was separate property.

4. Neither party could convey or burden the partnership property for his private debt; nor could legal process for a separate debt affect it.

5. The possession of one partner could not alter these principles.

6. The assignment by Hazard & Co. to the complainant of their contract, which was communicated to Lippitt by R. G. Hazard, and the continuance by Lippitt of the business after such assignment and notice, made Almy a partner, with the same rights, duties, and liabilities.

7. These rights continued till the partnership business was settled.

To third point we cite Rogers et al. *v.* Batchelor et al. 12 Pet. 221, 229, 230, 231, &c.; *Ex parte* Hamper, 17 Ves. Jr. 403, and Amer. notes by Sumner; Story's Part. § 27, pp. 37 – 42.

In this view the assignment by Lippitt to defendant was void, with or without notice.

The statutes of fraud and enrolment do not apply. It is not a conveyance by a man who has the title and retains a possession inconsistent with the deed, but a possession by a man consistent with the rights of the true owner, a lawful possession.

IV. But if it is a mortgage or a lien, as collateral security, to be treated in equity as a mortgage, the defendant is not a *bonâ fide* purchaser without notice, and having notice, he must redeem or account for the property.

The evidence of this knowledge will be found in his answer. He knew that half the profits of that mill could not have amounted to $10,000 up to December, 1835.

He knew the facts. He was bound to know the law. Either there was a partnership, and he could not buy from one partner; or he knew the machinery was held as collateral security, and he was bound to inquire how that account stood.

Again; on the 2d December, 1835, R. G. Hazard went to see Lippitt, at the request of Almy, to get a settlement, Lippitt declined; same day he left. He returned in the spring, told Wilbur of the cause of his abrupt departure, and that " he knew he had no more right to take that machinery from C. Lippitt in payment of his debt than he would have had to take Samson Almy's pocket-book, if he had left it in the keeping of Lippitt." He did not deny the charge.

Notice may be expressed or implied. "Whatever is sufficient to put a party upon inquiry, (that is, whatever has a reasonable certainty as to time, place, circumstances, and person,) is in equity held to be good notice to bind him." 1 Story's Eq. § 400; and see § 399, and notes to both sections; Buck *v.* Holloway, 2 J. J. Marsh. 176; Hardy *v.* Summers, 10 Gill & Johns. 317; Hoxie *v.* Carr, 1 Sumn. 172.

Where a party has knowledge of the facts, he has notice of the legal consequences resulting from those facts. The Ploughboy, 1 Gall. 41.

Wilbur v. Almy.

It affects the conscience of the party. Smith v. Shane & Morgan, 1 McLean, 27. Notice of such facts as with ordinary diligence will lead to a knowledge of an outstanding equity, is sufficient. Hinde et al. v. Vattier et al. 1 McLean, 118; 2 Powell on Mort. ch. 14, p. 562; 2 Eden, R. 224; 2 Sch. & Lef. 315, 328; 2 Sim. & Stu. 372, 380.

Independent of the evidence, Wilbur, in his answer, admits, first, he knew of the contract; second, that Hazard purchased the machinery; third, they were to be paid for it out of one half the profits.

He knew it had not been paid for at the time of their failure. Almy claims under them; Wilbur claims under Lippitt; he is bound by the knowledge of the facts, and purchased with notice.

V. The statute of limitation is not a bar.

1. The right of action accrued 25th November, 1836; action brought 17th October, 1842 — less than six years.

2. Wilbur went into actual possession, he says, 8th December, 1825, in his own right, and as agent and attorney of some of his co-mortgagees, yet the use and custody was not changed, nor did he set up a claim till demand and refusal.

3. His custody and that of Lippitt was consistent with the complainant's right till the demand and refusal.

4. The notice given by Hazard, 15th October, 1836, was notice to purchasers at that sale of an unrecorded lien, known to Wilbur. Wilbur did not purchase. Wilbur did not set up any claim to the possession of, or right to, the machinery. The sale was subject to prior existing equities.

VI. The exceptions to the master's report were properly overruled.

1. The first and second exceptions depend on the admissibility of the record found at p. 196, 197, and 198, in a case to which neither Almy nor Wilbur was a party. See 16 Pet. 331, 332.

2. The third exception assumes, that Almy is entitled to recover only what he paid the Hazards. We refer to the contract itself, and the letter of Lippitt.

3. The fourth exception sets up a *pro rata* scale of diminished value. We rely first on the master's report.

The value is to be proved,

First. By an estimate of persons who never saw it.

Second. By those who have seen it, examined, or used it.

Third. By the rents or products.

1st. Except Lippitt, no one of the witnesses of Wilbur ever saw it; and Lippitt says it was worth about $2000. Yet he himself said, in 1830, it was worth about $8000; insured it in 1836 for $6500; and when it was insured in 1844, the insurance company paid $3500.

Wilbur *v.* Almy.

2d. Complainant's evidence is mainly from persons who had seen it, examined it, or used it. Phillips, worth two thirds; A. Fenner, had seen it, worth one half; J. Fenner, had rented it, worth two thirds; Isaac Thompson, made an inventory of, and examined it, about two thirds; Alfred Ladd, hired it, value two thirds; E. Manton's estimated value, two thirds, insurance company.

3d. The rents or product. A. Fenner, J. Fenner, E. S. Williams, Manton, Ladd. The result is, that this mill rented at a rate which put the value of the machinery at about $7000.

4. The fifth exception is, that the master would not permit the defendant to contradict his answer.

1st. He could not have so amended it; *à fortiori* he could not disprove it. Rule 60, Sup. Ct.; 7 Gill & Johns. 389; Greenwood *v.* Atkinson, 4 Sim. 61. This would essentially have changed the ground of defence, and the whole issue. West. Res. Bank *v.* Ryker, 1 Clarke, 380; 2 Bland, 261, note.

No amendment can be allowed, unless the plaintiff will be left in the same situation as before. Jackson *v.* Parish, 1 Sim. 505; Daniel, 916, 917. Nor after the cause is set down for hearing. 4 Russ. 486.

5. The sixth exception is wholly unsupported by proof.

VII. It was not objected, in the court below, that the assignment of machinery to Almy was void.

In the bill, complainant states that he purchased from the assignees of said Hazard & Co. all the interest which said R. G. Hazard & Co. and the said assignees had in the said contract with said Lippitt, together with all their interest in said machinery &c. (p. 6). It is not denied, or in any manner put in issue by the pleading, or answer. It is in proof, that Low assented to the whole machinery being put into the hands of Almy; and that R. G. Hazard was the agent of the assignees.

The assent of Low would bind him as trustee. 2 Story's Eq. § 1281 to 1284; 4 Kent's Com. 307; Monell *v.* Monell, 5 Johns. Ch. 296; Willis on Trus. 194–196; Hewitt *v.* Foster, 6 Beav. 259.

Mr. Justice CURTIS delivered the opinion of the court.

Samson Almy filed his bill in the Circuit Court of the United States for the District of Rhode Island, stating that one Christopher Lippitt, on the 7th day of March, 1828, entered into a contract in writing with Hazard & Co., the effect of which was to create an equitable mortgage on certain machinery for the price thereof advanced by Hazard & Co., who were to supply Lippitt with cotton, receive and sell the cloth, allow him three and a half cents per yard for manufacturing, and credit half the profits towards paying for the machinery, retaining the other

half for their own services and the interest on the cost of the machinery. The bill further states, that in May, 1829, Hazard & Co. failed in business and transferred all their property to Thomas R. Hazard and Charles Low, in trust for the benefit of their creditors; and that on the 9th of March, 1830, the complainant purchased of the assignees their interest under the contract with Lippitt, by a written instrument of sale, of that date, a copy of which, annexed to the bill, is as follows:

The assignees of R. G. Hazard & Co. hereby sell and convey to Samson Almy the right, title and interest which they have to a certain contract with Christopher Lippitt, bearing date March (3d mo.) 7th, 1828, (a copy of which is hereto annexed) together with the balance due from said Lippitt on account of payment for machinery, as expressed in said contract; also their right, title and interest, to the machinery held as collateral security for the said balance due from said C. Lippitt agreeable to the aforesaid contract, a schedule of which is hereto annexed, for which Samson Almy agrees to pay them (the said assignees) or account with them for the sum of five thousand dollars; and it is further agreed, that if Low and Fenner should redeem their one half of the aforesaid contract by the payment of the drafts drawn upon them by R. G. Hazard & Co. on account thereof, and to return one half of the aforesaid five thousand dollars to said Samson Almy, he relinquishing to said Low and Fenner all claims upon the aforesaid one half part of the said contract.

Providence, 3d month 9th, 1830.
            For assignees of R. G. Hazard & Co.
                                    R. G. HAZARD,
                                    R. G. HAZARD & Co.,
Witness: A. E. Forbush.              SAMSON ALMY.

Whereas, R. G. Hazard, for the assignees of R. G. Hazard & Co., has made an agreement with Samson Almy, bearing date 3d month 9th, 1830, relative to contract existing between Christopher Lippitt and R. G. Hazard & Co., dated March 7th, 1828, and of the machinery held by them as collateral security, by debts due from Christopher Lippitt and drafts drawn on Low and Fenner, I hereby ratify and confirm the above agreements the same as if made by myself as assignee of R. G. Hazard & Co.

South Kingston, 3d month 10th, 1839.
                        THOMAS R. HAZARD, Assignee.
Witness: Robert Rathbone.

The bill further states, that from the time of the failure of Hazard & Co. till his purchase from the assignees, the complainant supplied Lippitt with cotton, pursuant to the original con-

tract between Hazard and Co. and Lippitt, having agreed with
the assignees so to do; that after his purchase from the assignees,
he continued to supply cotton to Lippitt, till September, 1832,
when Lippitt refused to receive more; that in August, 1831, he
also furnished to Lippitt a speeder, which cost five hundred and
fifty dollars; that in September, 1832, when Lippitt ceased to
receive cotton from him, there was due upon the mortgage the
sum of five thousand four hundred and five dollars $\frac{87}{100}$, for
which sum he then had a lien on the machinery; that Lippitt
transferred the machinery to Wilbur, the defendant, with notice
of the complainant's rights, and after the complainant had
demanded the machinery of Wilbur, the latter sold it and
refuses to account. The bill prays for an account of the value
of the machinery, and that Wilbur may be decreed to pay to the
complainant, out of the sum found to be its value, the money
due upon the mortgage, including the amount of the advance
made by the complainant to purchase the speeder.

The cause was heard in the Circuit Court, on the bill, answer,
and evidence, and a final decree made in favor of the complain-
ant; and thereupon the respondent appealed to this court.

The title of the complainant, as a purchaser from the assignees
of Hazard & Co., not being admitted in the answer, it is obvious
that proof of the assignment to him is indispensable. The bill
alleges it to have been made by the written instrument, a copy
of which has been given. By reference thereto, it appears to
have been executed by R. G. Hazard, for the assignees. R. G.
Hazard is examined as a witness by the complainant, but does
not state that he had any authority from the assignees to act for
them in this behalf, nor is there any evidence of such authority
in the record.

His act is ratified in writing by Thomas R. Hazard, one of
the assignees. This is not sufficient. Trustees must unite to
pass any title to property jointly held by them. *Ex parte* Rigby,
19 Ves. 463; Sinclair *v.* Jackson, 8 Cowen, 543, 583; Kirby *v.*
Turner, 1 Hopkins, 309; 2 Story's Eq. § 1280; Willis on Trus-
tees, 136. The previous authority or subsequent assent of Low
must be shown.

It is urged that, though Low, the other assignee, did not
sign the paper, nor ratify Hazard's act, by any writing, he did,
by acts *in pais.*

There are reasons why very clear proof of such ratification
should be required in this case. The first is, that the bill itself
states no such ratification. It relies on the written paper alone,
and does not suggest that after the execution of the paper, one
of the assignees ratified the transfer, by acts *in pais.* But
another, and more important reason, is, that this transaction

Wilbur v. Almy.

between Almy and R. G. Hazard, who undertook to act for the assignees, was not in accordance with the trusts, on which the assignees held the property. The nominal consideration of the transfer to Almy was five thousand dollars; the real consideration was a debt due to Almy from Hazard & Co. at the time they became insolvent, and the purpose of the transfer to Almy was to prefer that debt. This, neither Hazard & Co. nor the assignees, had a right to do. And the proof should be very clear, to induce the court to declare that a trustee has ratified, or acquiesced in, a breach of his trust, amounting to a fraud on the other creditors of Hazard & Co., whose rights he was bound to protect. We do not find such proof in the record. There is no evidence tending to show that Low was ever informed of the true nature of the transaction between R. G. Hazard and Almy, or had knowledge that the purpose of those parties was to give a preference to Almy's claim. And, consequently, if he had acquiesced in or even expressly ratified the transfer, while ignorant of its real character, it would have been open to him afterwards to have disaffirmed it. But it is not shown that Low did acquiesce in, or ratify the act of R. G. Hazard. The complainant put in evidence certain letters from Low to Lippitt, which have an important bearing on this part of the case. They are as follows:

PROVIDENCE, 6th February, 1832.

DEAR SIR: Yours, dated four days since, is just at hand. Contents noted. With regard to the contract, I am as desirous to have it adjusted as you, and am ready to attend to it at any time you may name. It will be necessary for you to take an account of what cotton, yarn, cloth, &c., you have on hand. You stated that Mr. Hazard informed you that he had purchased the contract of the assignees. That is not the case. I have made no disposition of it.

CHARLES LOW, *Assignee.*

PROVIDENCE, October 26, 1832.

Mr. Christopher Lippitt, Sir: Having been notified by you that you wish to close up the contract under which you have been manufacturing, and to take the machinery, you paying the deficiency of your half of the profits, you are hereby authorized and requested not to receive any more cotton from Samson Almy to manufacture under said contract, and to manufacture what cotton you have on hand as soon as practicable. You are requested also to render your accounts as soon as practicable, and we will have the accounts of the profits prepared as soon as practicable, with a view to a prompt and final settlement of the whole business.

" Mr. Almy was never authorized to supply you with cotton under the contract for his own account.

Respectfully, your obedient servant,

CHARLES LOW, *for self and*
*T. R. Hazard, assignee for R. G. Hazard & Co."*

PROVIDENCE, Nov. 13, 1832.

" DEAR SIR : I should like to know if you are furnishing yourself with cotton and not receiving it from Mr. Almy, as you have been heretofore. As for Rowland Hazard being my agent fo: settling the business, he cannot produce any thing to show that I ever empowered him to act for me in any one instance. I shall call upon Mr. Almy within a few days and ask him for a settlement. Yours, &c.,

CHARLES LOW, *Assignee for*
*R. G. Hazard & Co."*

In these letters, Low not only denies R. G. Hazard's agency, but Almy's right to supply cotton on his own account, and declares, in so many words, that he has made no disposition of the contract which created the mortgage, and Mr. Lippitt testifies that Low always told him R. G. Hazard never was appointed the agent of the assignees, and had nothing to do with their business. It does not appear that up to the time when he wrote the last of these letters, he was aware that Almy was supplying cotton to Lippitt by reason of an assignment of the contract to him. It does appear that he knew Lippitt received cotton from Almy under the contract; but this he had done for nearly a year before Almy took the assignment of the contract, by virtue of an arrangement between Almy, Lippitt, and the assignees of Hazard & Co. as the bill itself states; and notice of the discontinuance of that arrangement is not brought home to Low, until after Almy had ceased to supply cotton to Lippitt. The acquiescence by Low in Almy's acts of furnishing cotton, under the contract, is not therefore referable to an assignment of the contract to Almy, and still less does it amount to a ratification of such an assignment as the assignees were not able to make without a breach of trust.

If it were necessary therefore to decide the case upon this point, we must hold that Almy has failed to show a valid title from the assignees. But we are of opinion that independent of this defect in his title, the bill cannot be maintained.

It has already been stated that Almy did not purchase this mortgage, but took an assignment of it for the purpose of obtaining payment of a debt, which Hazard & Co. owed him at the time of their failure. This is proved; and at the same time

it is shown that when he ceased to furnish cotton to Lippitt, in September, 1832, his debt was paid. Chistopher H. Lippitt testifies:

" I did converse with Samson Almy, at different times, while he was stocking the mill, in relation to the interest he had in doing so. He said the only interest he had in furnishing stock for the mill was to get a debt to him from R. G. Hazard & Co.; that he did not care to continue the business after said debt was paid, and that after that it made no difference to him who stocked the mill, whether my father or anybody else. I told Mr. Almy that if it would be any damage to him for my father to stop receiving stock from him, that he might still continue to furnish the mill. Mr. Almy replied that it would be no damage to him, and that my father had better stock the mill himself, as he, Mr. Almy, had got his debt, and more too. Subsequent to my father's furnishing the mill, Mr. Almy gave him a letter of recommendation to a house in New York, for the purpose of aiding him in purchasing cotton. He did state that he had no further interest in having the mill run for him, as he had secured his debt as I stated in my answer to the previous cross interrogatory. He said it was a matter of indifference to him whether the mill and machinery was run any longer for him, or not, but that he would run it for my father's benefit, if so desired." Christopher Lippitt also testifies : "At the time I stopped manufacturing for Mr. Almy, we had some conversation about furnishing cotton. Mr. Almy says, that, if I were in your place, I wouldn't manufacture for them any longer, they are all bankrupt, you don't know who you are manufacturing for. I observed to Mr. Almy that, if I stopped receiving cotton from you, won't it be an injury to you? He said, no, not in the least, for I think I've got my pay, and more too. I then observed to him, that probably I might stand in need of some assistance from him, if I commenced on my own account; he promised to render me all the assistance that he well could, give me some recommendations and introductions, where I might buy cotton. Afterwards, some time in the year 1834, he gave me introductions to go to New York to buy cotton. I stopped by the advice and consent of Mr. Almy. The letter he gave was addressed to Messrs. Jenkins, Merrick & Co., New York ; I was also advised by Mr. Almy to send my goods to them for sale, and I did send most of my goods to them in future, accordingly. I never heard him say that he had any lien or claim on the machinery whatever. He said the contract between me and R. G. Hazard & Co. was placed in his hands by them for the purpose of getting a debt that R. G. Hazard & Co. owed him, or that he had become obliged or bound to pay for them."

There is nothing to control this evidence except the testimony of R. G. Hazard. He says, "S. Almy, the only probable purchaser, to whom it seemed safe to sell, objected on account of apprehension of difficulty with Low and Fenner, but by promising my personal services in the subsequent management of the business, and obligating myself by some other conditions, I prevailed upon him to make the purchase."

This is far too vague an account of the consideration and terms of the sale to be relied on to control the explicit declarations of Almy, and the inferences to which his conduct gives rise.

. This conduct tends to show he had only a conditional interest in the property and that his interest had terminated. He not only ceased to supply cotton in 1832, declaring, at the same time, that his debt was paid, and he had no longer any interest in the matter, but he suffered Lippitt to run the machinery, and treat it as his own, until his failure in December, 1835, when Lippitt conveyed it to Wilbur and others. It rested in their hands until November, 1836, when Almy demanded it of Wilbur. Nothing more appears to have been done or said by him in reference to the property, till October, 1840, when he wrote the following letter:

"PROVIDENCE, 10th month 23d, 1840.
"PELEG WILBUR,

"Respected Friend: I have consulted counsel respecting the claim I have against thee, and have made up my mind to commence a suit immediately, unless there is a settlement. If thee would like to see Mr. Hazard, he will be in town on the 26th instant.

"Thy friend,
"SAMSON ALMY."

Two years more elapsed, making ten years, from the time when he ceased to have any thing to do with the machinery. This bill was then filed, and R. G. Hazard is very active in the management of the suit, as he says, by reason of an understanding between Almy and himself, when the assignment was made. This understanding must have been included by him in that part of his testimony, where he speaks of promising his "personal services in the subsequent management of the business, and obligating himself by other conditions;" and, if one of those conditions was that Almy took the transfer, by way of security, and his debt had been paid, it is quite consistent with Almy's real relation to this property that he should lie by ten years, and when he moved that R. G. Hazard should be active also.

But we find another piece of evidence in the record, to which it is proper to advert. It is the examination of Almy before the master upon the subject of his title, in which he has undertaken to give what he calls "the history of the whole matter." It is as follows:

"In reply, I must give you the history of the whole matter. In 1829, I think, I made arrangement with Rowland G. Hazard, Low & Fenner, and Christopher Lippitt, to furnish stock to Christopher Lippitt under the contract made by R. G. Hazard & Co., and Christopher Lippitt, they agreeing to give me one half of the profits for doing the business. We went on in that way, until I made the purchase of the machinery, after which I became sole owner and went on under the contract. At the time of R. G. Hazard & Co.'s failure, they owed me five or six thousand dollars, due by note, and the consideration of the contract or bill of sale was those notes, so far as they were required; that is, the agreement was that that bill of sale, so far as it went, should go to cancel these notes. The notes thus cancelled, it is my impression, were surrendered to R. G. Hazard, as agent for the assignees. I can't say that Mr. Hazard acted as agent of the assignees when I surrendered the notes to him: he did when the contract was made. I can't remember when I surrendered the notes to Mr. H., nor how many of them there were. I could ascertain, if time were allowed."

This is perfectly explicit, except on one point, and that is, whether the transfer to him was an absolute sale, extinguishing the notes, or by way of collateral security for the notes. A close examination of his statement will tend to show it to have been the latter.

He says, "the consideration of the contract, or bill of sale, was those notes, so far as they were required; that is, the agreement was, that that bill of sale, so far as it went, should go to cancel those notes."

But, if the consideration of the sale was the extinguishment of the notes, what is meant by its extinguishing them, so far as it went? This language is intelligible, if the agreement was that he should work out his debt through this contract with Lippitt. In such case, the bill of sale might be said to extinguish the notes so far as it went; that is, so far as it should prove to be effectual for that purpose. And this construction is much strengthened by the fact that he does not profess to have surrendered any of the notes at or about the time when the transfer was made to him, and there is no reason to believe he did so before his debt was paid. Taking this statement of Almy, in connection with his repeated declarations to the Lippitts and his conduct in reference to this property, we cannot doubt that the trans-

fer was made solely to enable him to obtain payment of these notes by means of the contract with Lippitt, and that payment was thus obtained.

Other questions have been made in the case, which we have not found it necessary to decide. Our opinion is that the decree of the Circuit Court should be reversed and the bill dismissed with costs.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Rhode Island, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed. by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs; and that this cause be, and the same is hereby, remanded to the said Circuit Court with directions to dismiss the bill of complaint with costs.