SOCIETY OF SHAKERS AT PLEASANT HILL et al. v. WATSON et al.

(Circuit Court of Appeals, Sixth Circuit. June 4, 1895.)

No. 272.

1. FEDERAL COURTS—JURISDICTION—CITIZENSHIP.

W., the owner, and S., the pledgee, of a note, prepared and verified a bill to charge such note as a lien on the property of the maker. The bill contained proper allegations of diverse citizenship. Before it was filed, S. died, but the bill was filed without change. Subsequently, the executrix of S. filed a so-called "supplemental bill," setting out the preparation and filing of the original bill and her interest in the subject-matter, but making no allegation as to her citizenship. *Held*, that W. was the only party to the bill as originally filed, and, his title to the note being a sufficient foundation for the suit, the court had jurisdiction, which was not ousted by the subsequent intervention of S.'s executrix, whatever her citizenship might be.

2. EQUITY—JURISDICTION—MULTITUDE OF PARTIES.

The Society of Shakers at P., in Kentucky, are an unincorporated community, having a membership of about 100, which is constantly changing by additions, withdrawals, and deaths. The property of the community, pursuant to articles of covenant between the members, is held in a mass in common, without any individual interest in any member, and is managed and disposed of, for the purposes of the society, by certain trustees chosen by the society from time to time. *Held*, that a suit upon a note executed in behalf of the society by the trustees was properly brought in equity, even without regard to the statute of Kentucky (Act Feb. 11, 1828) giving the right to sue in equity in such cases, and that it was sufficient to make parties the society and the trustees for the time being, who were also members of the society.

3. SAME—LIEN.

*Held*, further, that an instrument in the form of a promissory note, executed in behalf of such society by its trustees, in the form in which they were accustomed to do business, and in return for money which went to increase the funds of the society, created an equitable lien upon the property of the society.

4. PRINCIPAL AND AGENT—SIGNATURE BY AGENT.
    Where the language of an instrument, with respect to the party to be charged, is equivocal, and such instrument is signed by an agent in his own name, with the addition of the title indicating his agency, evidence is admissible, as against the principal, to show that the instrument was in fact intended as his obligation, and not that of the agent.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This was a suit by Oliver Watson and Letitia Souther, as executrix of Henry Souther, deceased, against the Society of Shakers at Pleasant Hill, Ky., Napoleon D. Brown, James W. Shelton, and Mary Jane Sutton, trustees of said society, to subject the property of the society to a charge for the payment of a note. The circuit court rendered a decree for the complainants. Defendants appeal. Affirmed.

The original bill in this case was filed on the 11th day of May, 1891, in the names of Oliver Watson and Henry Souther, as complainants, against the defendants above named, for the purpose of subjecting the property of the said Society of Shakers, one of the above-named defendants, to an equitable charge for the payment of a promissory note alleged to have been executed by the said society on the 18th day of October, 1882, and given to one M. M. Mays, of which the following is a copy:

"$9,985.                                                    October 18, 1882.

"Seven years after date, we promise to pay to the order of M. M. Mays, or bearer, the sum of nine thousand nine hundred and eighty-five dollars ——/100 dollars, value received, with interest at the rate of 6 per cent. per annum from date until paid. Negotiable and payable at the Fourth National Bank, Cincinnati. If not paid when due, to bring 8 per cent. from date.

                                                   "Dunlavy & Scott.
    "Trustees of the Society of Shakers at Pleasant Hill, Kentucky."

At the time of the bringing of this suit, the defendants Brown, Shelton, and Sutton were the trustees of the society, and were made parties as such, and also in their individual capacities as members thereof. Dunlavy and Scott and one Boisseau were, at the time of making the note, trustees of the society. This note was sold and indorsed by Mays to the complainant Watson on or about July 2, 1889, in part payment for a farm known as "Chatham," near Fredericksburg, Va. In August, 1889, Watson borrowed from the complainant Souther the sum of $5,000, and, as collateral security for the payment of that sum, pledged the above-mentioned note to Souther, and delivered it to him, but did not indorse it. The original bill was prepared and signed and sworn to by Watson in New York on the 13th day of March, 1891, and by Souther in Virginia on the same day, and was thereafter transmitted to their attorneys in Kentucky, to be filed in the proper court. It was not filed, however, until May 11th following. In the meantime said Souther died, leaving a will, which was probated on April 17, 1891; and his wife, Letitia Souther, was appointed and qualified as the executrix thereof. On the 7th day of September, 1891, Letitia Souther, as executrix, filed what is termed in the record a "supplemental bill," setting out the circumstances above stated relating to the preparation of and swearing to the original bill of complaint and the filing thereof, the death of said Henry Souther, his leaving a will, the probate thereof, and her appointment as executrix. In this supplemental bill she adopted and reaffirmed the statements and allegations of the original bill, and prayed to be substituted as complainant in the place of the said Henry Souther.

The defendants appeared, and on the 2d day of November, 1891, filed their demurrer to the original bill and supplemental bill, in which they set out as special grounds thereof: "First. That it appeareth on the plaintiffs' own showing by the said bill that their only cause of action, if any, is for money due upon the alleged note exhibited with the bill, for which they have an adequate and complete remedy at law. Second. That it appeareth on the face of the note sued upon and exhibited with the bill that the same is not the obligation of the Society of Shakers at Pleasant Hill, Ky., and is not binding upon the defendants or either of them. Third. That it appears from the bill and exhibits filed

that the said Dunlavy and Scott had no power or authority to bind the Society· of Shakers at Pleasant Hill, Ky., by the alleged obligation sued on."

After a hearing upon the demurrer, it was overruled by the court; and, upon the suggestion of the court, the bill was amended, but no new fact material to the questions presented was set out in the amendment. Thereupon the defendants answered, setting out the following grounds of defense: First. (a) That the society never executed the note. (b) That the society never by the note promised to pay according to the tenor of the note or otherwise. (c) That the note was not signed in a proper manner to bind the society or its estate, nor in accordance with the custom and usage of the society or its trustees. (d) That the alleged note or contract was not authorized by or consented to or approved by said society, or the ministry or elders thereof. Second. That the note is not the act and deed of Dunlavy & Scott, nor of said Dunlavy, Scott & Boisseau, or either of them. Third. That the note was not signed, executed or delivered, or its execution or delivery authorized or consented to, by all or any or either of said trustees. Fourth. That the note is without any good or valuable consideration. Fifth. That neither said trustees, nor any or either of them, had any power or authority to bind the said society or its estate or property by the execution of the note. Sixth. That the alleged holders or owners of the note were not innocent purchasers thereof, but took the same with notice, and fully protected themselves in the transaction. Seventh. That neither Dunlavy & Scott, nor either of them, as trustees of said Shakers at Pleasant Hill, Ky., or otherwise, had any authority to make or use the paper sued upon, or to bind the society thereby.

Replication having been filed, proofs were taken upon the issues presented by the answer. The defendants the Society of Shakers at Pleasant Hill are a community of people living in Mercer county, in the state of Kentucky, and are commonly known and described by the name last mentioned; and the defendants Brown, Shelton, and Sutton are members of the community, and at the time of the commencement of this suit were its duly appointed and authorized trustees or agents, selected in pursuance of the articles of covenant of the community, and, as such trustees, hold all the property of the society. The society has an actual membership of more than 100 people, and the membership is constantly changing by additions, withdrawals, and deaths. Upon the coming together of the community, the several members of it subscribed to certain articles of covenant, a copy of which is attached as an exhibit to the bill. The articles were duly recorded in the register's office of the proper county. All their property, both personal and real, is held in a mass in common; no one of the members claiming any specific interest therein, everything being devoted to the joint interest of the church. The articles of covenant state that it is "fit and proper that certain individuals should be intrusted with the care of the temporal interest of the church as trustees or agents"; and then it is therein covenanted that the said trustees or agents and their successors shall be duly invested with the said office of trustees or agents, and "empowered to exercise all the duties thereof," and "that it shall be the duty of the trustees or agents to take the general charge and oversight of all and singular the property, estate, and interest dedicated, devoted, and given up as aforesaid to the joint interest of the church, with all gifts, grants, and donations that may at any time be given or devoted for the benefit of the church or for the relief of the poor or any such charitable use or purpose; and the said joint interest, estate, gifts, grants, and donations shall be held by them in the capacity of trustees or agents, and shall be and remain forever inviolably under the care and oversight and at the disposal of the trustees and agentship of the church in a continual line of succession." The said articles of covenant contain this further provision or covenant, to wit: "And we do by these presents covenant, promise, and agree that all the transactions of the trustees or agents in the use or disposal of the joint interest of the church shall be for the mutual benefit of the church, and in behalf of the whole body, and to no personal end or purpose whatever; but the trustees or agents shall be at liberty, in union with the body, to make, present, and bestow deeds of charity upon such as they may consider the proper objects, that are without; and when, by death or other means, any trustee or agent shall cease to act in his office as aforesaid, then all and singular the power invested in or duties incumbent upon him shall be transferred and devolved upon his successor, who shall be appointed to fill his place in said office and trust, so that each individual appointed to the office of trustee or agent of the church shall be vested

with the power and authority of managing and disposing of the property and interest of the church as aforesaid, and of making all lawful defense for the security and protection of the joint interest and privileges of the church, and all the transactions of such members shall be valid so long as they act in the official capacity of trustees or agents in union with the body according to the tenor of the covenant, and no longer." The said articles contain this further provision or covenant, to wit: "And we further covenant and agree that it shall be the duty of the trustees to keep or cause to be kept in a book or books provided for that purpose a true copy of this covenant, together with all other records or matters of a public nature that may be necessary for the information and satisfaction of all concerned, and for the security of the joint interest of the church committed to their care; and, further, that the trustees shall make application to the proper authority for the covenant to be duly recorded in the county office of this county, together with the names of all the subscribers who previously shall have subscribed to it; and in all deeds, wills, grants, etc., which may thereafter be given or conveyed to the trustees or agents aforesaid for and in behalf of the joint body or church, express reference shall be had to the same, specifying the date or time when it was subscribed or first begun to be subscribed." The said articles contain this further provision or covenant, to wit: "We do freely and cordially covenant, promise, and agree together for ourselves that we shall never hereafter make any account of any property, labor, or service devoted by us to the purpose aforesaid, or bring any charge or debt or damages or hold any demand whatever against the church or community, or any member thereof, on account of either property or services given, rendered, or consecrated to the aforesaid sacred and charitable uses." These articles of covenant, originally established in 1815, were amended somewhat in 1844, but not in respect to any matter deemed material to the result. The article providing for trustees distinctly declares the trust, and in regard to real estate says that they shall "have in trust the fee of all the land belonging to the church."

Considerable testimony was taken in support of the defenses set up in the answer by the defendants, and considerable also by the complainants in rebuttal thereof. It is not worth while to go into a discussion of the details of it. As gathered by the court, the most material facts in regard to the execution of the note and its subsequent history are as follows: It is sufficiently proved that Dunlavy and Scott were at the time when the note bears date the executive officers of the society. Boisseau was also one of the trustees, but he was not an active member of the board, if we call it such, and the business of the society was actually conducted by Dunlavy and Scott in their capacity as trustees and agents. Such was the general rule. They signed the obligations of the society in substantially the same form in which the note is signed, and it sufficiently appears that this was the method and usage in business dealings generally in which the society was concerned; and that this mode of conducting their affairs and signing their written obligations was well known to and recognized by all the members of the society, no question, so far as appears, ever having been raised as to the authority of Dunlavy and Scott to conduct the business in this way, or of the obligation of the society to respond to their acts so done, as being authorized by the whole body. Mays, the payee of the note, was an adventurer, engaged in speculations of one kind and another in Ohio, and, having some money for investment, went to Pleasant Hill, in Kentucky, and loaned the amount represented by the note to Dunlavy and Scott for the society. It is proven beyond a doubt that the signatures of Dunlavy and Scott are in the handwriting of Dunlavy, Scott being present and assenting to the transaction. There are some circumstances which tend to beget a suspicion that there may have been some unfair dealing on the part of Mays in procuring the note, but the grounds of such a charge are either quite vaguely shown, or rest upon mere conjecture. The note was held by Mays until, as before stated, it was sold and indorsed by him to Watson, and by the latter pledged to Souther. All this occurred before the maturity of the note. There is no proof that Watson, at the time he took the note, had any knowledge of any defense to it, except that he was informed by correspondence with the society during the pendency of the negotiations between himself and

Watson for the sale of the farm and the taking of the note that the society claimed that the note was never executed by or in behalf of the society, and that the society claimed that it had never received the money for which the note purported to have been given.

The legislature of the state of Kentucky, on the 11th day of February, 1828, passed an act relating to suits against such societies as the one here sued, which is as follows:

"An act to regulate civil proceedings against certain communities having property in common.

"Section 1. Be it enacted by the general assembly of the commonwealth of Kentucky. That it shall and may be lawful for any person having any demand exceeding the sum of fifty dollars, founded on any contract implied or expressed against any of the communities of people commonly called 'Shakers,' living together, and holding their property in common, to commence and prosecute suits, obtain decrees, and have execution against any such community, by the name or description by which said community is commonly known, without naming or designating the individuals of such community, or serving process on them, except as is hereinafter directed. All such suits shall be by bill in chancery, in the circuit court of the county in which such community reside; and it shall and may be lawful to make parties to such suits, all other persons by name who may have any interest in the matter in controversy, or who may hold any property in trust for said community, or may be indebted to them.

"Sec. 2. Whenever any subpoena founded on any such bill shall be placed in the hands of any officer to execute, he shall fix a copy of such subpoena on the door of the meeting-house of such community, shall deliver a copy to some known member of the community, and shall read the subpoena aloud at some one of the dwellings of said community, at least ten days before the term of the court at which said community are required to answer, and on these facts being returned in substance on the subpoena, they shall constitute a good service of process of said community, so as to authorize the court to require and compel an answer agreeable to the rules and usages in chancery.

"Sec. 3. All answers for and in behalf of such community may be filed on the oath or affirmation of one or more individuals of such community, who shall moreover swear or affirm that he or they have been nominated as the agents or attorneys of such community, to defend such suit, and thereupon the individual so answering shall have full power and authority to manage and conduct said suit on the part of such community, or to settle and adjust the same, and all notices to take depositions against said community may be served on such agent or left at their place of residence, provided, that for good cause shown, the court may at any time permit such agents to be changed or substituted by others of the community; provided, however, that the agents or defendants shall not be compelled to answer on oath to any charges or allegations, which are, by the existing rules of law and equity, cognizable alone in the courts of common law; and provided, further, that in all such cases as mentioned in the foregoing proviso, the defendants shall be entitled to a jury, if they, or any one of them, shall signify their desire to that effect at any time before the trial shall have been gone into, and in such case above described either party may require the personal attendance of witnesses and a viva voce examination, as though the suit were at common law, and the court shall direct such process at the request of either party, or summonses may issue as in other cases of the kind.

"Sec. 4. Be it further enacted that nothing in this act contained shall be so construed as to render the communities aforesaid, or any of them, liable upon contracts entered into by any individual or individuals, not authorized by their laws and usages to contract for such community; nor shall it be so construed as to give to any person, who, having been a member of such community, has heretofore left it, or may hereafter leave it, any right, in consequence of such membership, which he or she would not have had if this act had not passed; but such right shall depend upon and be determined by the laws, covenants and usages of such society and the general laws of the land, except as to the mode of suit.

"Sec. 5. Be it further enacted, that, any community which may be sued under the provisions of this act shall have the same right to change of venue as other defendants."

This statute is quoted at large for the reason that its various provisions illustrate the status and character given to such societies by the laws of Kentucky, and by which they are thus recognized.

The court below decreed for the complainants, declaring the note to be an equitable charge upon the property of the society, and providing for the enforcement of the lien as prayed by the complainants. The defendants bring the case here on appeal.

Stone & Sudduth, D. W. Lindsey, R. P. Jacobs, and P. B. Thompson. Sr., for appellants.

St. Geo. R. Fitzhugh and C. A. Hardin, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

Having stated the case as above, SEVERENS, District Judge, delivered the opinion of the court.

The first question raised by the defendants is one of jurisdiction, it being contended that the citizenship of Letitia Souther is not sufficiently shown to be different from that of the defendants. In the original bill, Watson was described as a citizen of New York, and Henry Souther as a citizen of Virginia. The bill styled "supplemental," of Letitia Souther, does not show her citizenship. The amended bill describes her as being a nonresident of Kentucky, but does not allege her citizenship there. The defendants, therefore, insist that she, being, as they also contend, a necessary party to the suit, is not shown to be a citizen of some other state than Kentucky, and so that the court is without jurisdiction. The general rule here invoked is undoubtedly well established as the result of the statutory provisions upon the subject. Robertson v. Cease, 97 U. S. 646; Insurance Co. v. Rhoads, 119 U. S. 237, 7 Sup. Ct. 193; Everhart v. Huntsville College, 120 U. S. 223, 7 Sup. Ct. 555.

But attention must be given to the peculiar circumstances shown by the record in order to ascertain whether the rule is applicable. At the time when the original bill was filed, Henry Souther was dead. Counsel for defendants insist, and we think rightly, that Watson was therefore the only party complainant in the bill then filed, and that for all practical purposes it should be treated as though Souther had not been named as a party at all; and we also agree to their further proposition that, when Letitia Souther came in, she came as an original party. The new matter brought forward by her bill was in no proper sense supplemental. Her interest had not before been represented in the suit. But the court had already acquired jurisdiction of the case. Watson, who held the general property in the note upon which the suit was brought, had filed his bill more than four months before Letitia Souther came in. She had an equitable interest arising upon the pledge of the note as collateral to Watson's indebtedness to the estate she represented. Watson's title was a sufficient foundation on which the case could stand. It is true the pledgee of the note was a proper party, and, in a sense, a necessary party to the suit. She was not a necessary

party in giving jurisdiction to the court over the case, and enabling it to make a decision; but she was a necessary party to the rendition of such a decree as should bind all the parties interested in the subject-matter. If the suit had proceeded without the intervention of Letitia Souther, it would have been defective in respect of parties, but not fatally so. It would have given ground for demurrer, and probably for an objection, to be taken in the answer or at the hearing, though the objection is rarely allowed to be first started on an appeal. McGahan v. Bank, 156 U. S. 218, 15 Sup. Ct. 347. A party, by failing to seasonably insist that necessary parties to a complete decree are not before the court, "often suffers the evils of inadequate litigation by leaving some branch of the subject still open to future controversy." The court also might take the objection sua sponte at the hearing, and order the case to stand over for the bringing in of the party having an equitable interest in the claim. Story, Eq. Pl. § 75; Calv. Parties, 113–116; Mitf. Eq. Pl. 180; 1 Daniell, Ch. Prac. c. 5; Coop. Eq. Pl. 33. That the court may do this, of course, necessarily implies that the case is under its jurisdiction and authority. The defendant should be required to take the objection seasonably. If he does not, and goes on with the litigation, and, as here, first raises the objection on appeal, he ought to be held to have waived all defects except such as deprive the court altogether of the power to afford any effectual relief. If the defendant, by proceeding, waives such defects, he exposes himself to further litigation at the instance of the party interested in, but not represented in, the former suit. But that would be the result of his own negligence in not requiring all parties to be brought into the first suit, so that the decree would protect him.

If Watson had obtained a decree upon the original bill, he would have held the fruit of the suit subject to the same equities as he held the note; that is, subject to a trust in favor of his pledgee for the amount of his debt. Here Mrs. Souther was allowed to intervene for her interest early in the suit. That which the defendants might have insisted on, or the court on its own motion have directed, was seasonably done, and no inconvenience has ensued. Permitting a party to intervene in a pending suit to represent an interest involved does not oust the jurisdiction of a federal court already acquired by reason of the diverse citizenship of the original parties, of whatever state the intervener may be a citizen. Stewart v. Dunham, 115 U. S. 61, 5 Sup. Ct. 1163; Freeman v. Howe, 24 How. 450; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27; Phelps v. Oaks, 117 U. S. 236, 6 Sup. Ct. 714; Osborne v. Barge, 30 Fed. 805. We think, therefore, that the jurisdictional objection founded on the citizenship of the parties is not well taken.

The next ground of defense is that the court had no jurisdiction, because there was a plain and adequate remedy at law. What the supposed plain and adequate remedy at law is in such a case is not very clearly shown to us. It was the society, and not the individual members, which made the note. Some of the members were adults, and some infants. The society was not a "partnership."

Neither was it a "corporation," in the proper sense of that term. The members have no property, having renounced all to the society. It is a somewhat anomalous case, but is yet of a kind which occasionally appears in the books of reports, and in regard to which the law has been settled by a number of decisions. It is urged that the statute of Kentucky in regard to the remedy in such cases is of no avail. It is said that it is unconstitutional, in that it attempts to vest a court of equity with jurisdiction of a purely legal right. It is further said that the statute has been repealed by implication, and that, at all events, it was not competent for the legislature of Kentucky to determine the jurisdiction of the equity courts of the United States, or to interpolate therein a strictly legal cause of action. We think none of these suggestions are well founded. The law which is thought to repeal the statute is the general practice regulation of the Code of the state, which does not specifically refer to this statute, and is not so inconsistent with it but that both might harmoniously be wrought out together. Frost v. Wenie, 157 U. S. 46, 15 Sup. Ct. 532. Nor can we see any good reason for holding the law void for the reason suggested, or for saying that the equity courts of the United States should altogether disregard it. We do not refer to that act for the details of practice provided by it, but only to show that, by providing the equitable remedy, the rights to be secured were recognized as of an equitable character; for, while the statutes of a state may extend the subject of equity jurisdiction, they do not affect the mode of its exercise. Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495; Whitehead v. Shattuck, 138 U. S. 149, 11 Sup. Ct. 276; Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554.

That the rights here dealt with partake of an equitable character had been decided in the courts of chancery long before the date of this statute, and the doctrine has now become so well established that we should not hesitate to support the jurisdiction if the Kentucky statute had never been enacted. Let us first suppose that the note constitutes a legal obligation upon which an action at law can be maintained. Against whom shall the suit be brought? Not against the society, for it is not a corporation, and has no legal existence as an aggregation. If the suit be brought against the members, what members are liable? Probably such only as were sui juris at the time of making the note. But some of these are dead, and others may have withdrawn. The suit, if brought, would be liable to repeated abatements. Perhaps these difficulties could be got along with. But a greater one would be experienced in the remedy for the satisfaction of the judgment. The members have no private property. All is merged in the common mass. There is no inheritance and no estate which would go to an administrator. It would be an extremely embarrassing task to identify any legal interest of the members in the common property upon which an execution could be levied. It is true there is a statute in Kentucky making the interest of a cestui que trust leviable on execution.

Section 21, art. 1, c. 63, p. 829, of the General Statutes of Kentucky, provides as follows:

"Estates of every kind held or possessed in trust shall be subject to the debts and charges of the persons to whose use or for whose benefit they shall be respectively held or possessed, as they would be subject if those persons owned the like interest in the property, held or possessed, as they own or shall own in the use or trust thereof."

If this statute applies to the interest of members of such a society, such a proceeding would result in rights for contribution among the members, and consequences altogether alien to the purpose and interests of the society would ensue. It is to such a case that the jurisdiction of a court of equity is peculiarly applicable. By the flexibility of its procedure to fix the liability and the scope of the remedies it is authorized to employ for its satisfaction, it can furnish complete relief where the remedy of the common law is neither plain nor adequate. A large branch of equity jurisdiction has always been concurrent with that of the courts of law,—that is, has extended over the same general subjects as those taken cognizance of in actions at law; but where, from the nature of the circumstances, and on account of the inadequacy of its remedies, a court of law cannot afford the due and appropriate relief. In these cases there is an obligation of a legal character at the foundation of the suit, like the note in the present case, but there is some difficulty either in the manner in which the obligation rests upon persons or property, or in the efficiency of the process belonging to the court, which makes the legal remedy inadequate. Boyce's Ex'rs v. Grundy, 3 Pet. 210; Wylie v. Coxe, 15 How. 416; Barber v. Barber, 21 How. 582.

In Weymouth v. Boyer, 1 Ves. Jr. 424, Mr. Justice Buller, sitting for the lord chancellor, says:

"We have the authority of Lord Hardwicke that if a case was doubtful, or the remedy at law difficult, we would not pronounce against the equity jurisdiction. This same principle has been laid down by Lord Bathurst."

It would result from these considerations that this bill could be maintained if the note could be regarded as imposing a technically legal liability. But we doubt if it can be so regarded, and are inclined to think that the rights secured by it are of a purely equitable character. Looking to the circumstances in which this note was given, we think it cannot be doubted that it was intended to charge the property of the society. The society itself, as has already been said, was not a corporation of which the law could lay hold, nor was it a partnership. It was but a mere name given to a community whose membership is constantly shifting. The note was not effectual against anything but this changing body, and that only by supposing it to be intended to be a charge against the property which all the members of the society had concurred in putting in a common mass in the hands of the trustees of the society. It could not be accepted that the society intended to obtain the money, appropriate it to its own use, and give this note as an idle form, which it is unless it charges their property. And the consideration of the note went

to augment the fund upon which it is sought to charge it. "Rights in equity equivalent to liens may arise under various circumstances. Thus, real or personal estate may be charged by an agreement, express or implied, creating a trust which equity will enforce." Snell, Eq. (2d Ed.) 274. "In courts of equity the term 'lien' is used as synonymous with a charge of incumbrance upon a thing, where there is neither jus in re, nor ad rem, nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of property, as to a duty or intention implied on his part to make the property answerable for the specific debt or engagement. Mr. Justice Erle once remarked [Brunsdon v. Allard, 2 El. & El. 27] that 'the words "equitable lien" are intensely undefined.'. It is necessarily the case that something of vagueness and uncertainty should attend a doctrine that is of such wide and varied application as is this of equitable lien; and yet the principles are as well defined as other equitable principles, and their application to certain well-established classes of liens is well settled. To apply them to that undefined class of liens which arises from the contracts of parties may be more difficult, because these liens are as various as are the contracts, and precedents which exactly apply may not be found. This wide application of the doctrine is one element of the importance of this branch of equity jurisprudence." 1 Jones, Liens, § 28. And Pomeroy, in discussing the subject of equitable liens, says: "There is no doctrine which more strikingly shows the difference between the legal and equitable conceptions of the judicial results which flow from the dealings of men with each other from their express or implied undertakings." 3 Pom. Eq. Jur. § 1234.

In Perry v. Board, 102 N. Y. 99, 6 N. E. 116, the plaintiff had in good faith advanced money for the improvement of certain property which was in the hands of the defendant upon a trust to raise money by mortgage to pay off this and another debt. The money so raised was not sufficient after paying the other debt to satisfy the plaintiff. He sued in equity to charge the trust property. He had no legal obligation of the trustee, nor of the party which created the trust, upon which he could maintain an action, and no recourse but to the property itself. The court of appeals held that, because of the lack of any available remedy for the reimbursement of the money which he had bestowed in augmentation of the trust property with the knowledge of the officers of the parties interested in the trust property, the plaintiff was entitled to an equitable lien thereon, which was directed to be enforced. This case is cited by Jones in his work on Liens in support of the proposition that equity will afford a lien where the plaintiff's rights can be secured in no other way. 1 Jones, Liens, § 39; 1 Beach, Mod. Eq. Jur. §§ 290, 291. And see, also, Riddle v. Hudgins, 7 C. C. A. 335, 58 Fed. 490, and cases cited.

The bill in this case makes the society, the trustees, and three of the members parties defendant. In our opinion, this was sufficient. It belongs to that class of cases in which it has been held that when the parties are numerous, and it is inconvenient to bring them all be-

fore the court, a representation of them may be constituted, and the representatives be made parties to prosecute or defend for all.

Lord Hardwicke, in Vernon v. Blackerby, 2 Atk. 144, mentions the case of The Bubble, decided in the high court of chancery in 1720, in which, "although several persons were interested, yet they lodged a general power and authority in some few only, and therefore, to avoid inconvenience from making such numerous parties, this court restrained them to those particular persons who were intrusted with this general power."

In Meux v. Maltby, 2 Swanst. 277, the bill made the treasurer and directors of a joint-stock company, who were also holders of shares, defendants to the suit. Objection being made for want of parties, it was held, upon review of many previous cases, by Sir Thomas Plumer, master of the rolls, that the objection was not maintainable. In delivering judgment he said:

"Here is a current of authority, adopting more or less a general principle of exception, by which the rule that all persons interested must be parties yields when justice requires it, in the instance of either plaintiffs or defendants. The rigid enforcement of the rule would lead to perpetual abatements. This, therefore, cannot be regarded as a new point, or as creating a difficulty. It is quite clear that the present suit has sufficient parties, and that the defendants may be considered as representing the company. Can I then dismiss the bill for want of parties, because all the proprietors, admitted to be so numerous that it is difficult to find them, are not before the court? There is no fair distinction in that respect between this case and those which have been stated."

This was a case where the parties themselves had lodged the authority of management in certain officers. The same principle obtains where the court itself adopts a few as representatives of the whole. Story, Eq. Pl. §§ 117, 118.

We therefore conclude that the suit is properly brought in equity, and that the defendants are rightly constituted.

The next defense presented is that the note was not so executed as to bind the society, but only the individuals, Dunlavy and Scott. The note is signed in their names, as "Trustees of the Society of Shakers at Pleasant Hill, Ky." Prima facie it might be that, under the rule adopted by many authorities, the result contended for might follow such a mode of signing, especially where the note has passed into the hands of a party who had no acquaintance with the facts in which the note originated, and insisted on holding the signers to the rule. But here the defendant, the principal of the persons signing the note, raises the objection. When an instrument like this bears on its face a suggestion that it is executed by one acting as an officer or agent of another, evidence is admissible as against the principal to show that the instrument was intended as the obligation of the party who was in fact the principal in whose behalf the business was done, and not that of the agent. The case is governed by the rule laid down in Metcalf v. Williams, 104 U. S. 93. The cases of Brockway v. Allen, 17 Wend. 40, and Kean v. Davis, 21 N. J. Law, 683, cited by Mr. Justice Bradley in Metcalf v. Williams, are also precisely in point. The doctrine of these cases is that, while the general rule is as here contended, still it is competent to

prove the surrounding circumstances where the language of the instrument with respect to the party to be charged is equivocal. The evidence in the present case leaves no doubt whatever that the society was intended to be the obligor. The suggestion of the society that its trustees should be held personally responsible for the debt is altogether devoid of merit.

It is also insisted that neither Dunlavy nor Scott had power to bind the society. The defendants contend that, Boisseau having been also a trustee, his concurrence in the act of giving the note was necessary. It is undoubtedly the general rule that all the trustees appointed must participate in the act of agency. Mechem, Ag. § 77; 1 Perry, Trusts, § 411; Wilbur v. Almy, 12 How. 180. And, if the society had held its trustees to the rule, it might very well be that this obligation, thus executed, could not at law have been enforced. But the evidence demonstrates that it did not in the transaction of its business stand upon the rule, but permitted the individuals of the trustees, sometimes one and sometimes two, to conduct the business of the society. Indeed, it quite clearly appears that Dunlavy was the recognized manager, who often conducted its important affairs without any active intervention of the other trustees. We think the society should not now be allowed, having got the money procured by its ordinary methods and evidenced by an instrument executed in the manner in which for many years its obligations had without dissent been executed, to say that its adopted method was irregular and did not bind it. Besides, if the execution of the instrument was defective, it would not on that account fail in equity. The real purpose and effect of the instrument is to prove the fact upon which the society's property should be charged; that is, that the money it represented was loaned to the society. 3 Pom. Eq. Jur. (2d Ed.) § 1237; 1 Beach, Mod. Eq. Jur. § 292; Allis v. Jones. 45 Fed. 148.

The observations made in regard to the defense last mentioned apply to the further ground of defense, which is, as stated in the language of the brief submitted by appellant's counsel, that "the trustees had no power to bind the society upon negotiable paper, nor did Dunlavy's signing of the name Dunlavy & Scott bind the society." It is proven that the society was in the habit of using such paper so executed. If it did not govern itself by its own rules, or permitted its agents to make a rule of practice of their own, the society should respond to the results of a rule of practice thus sanctioned.

The last ground of defense, and which really ought to have stood first in the line, is that there was no consideration for the note, and that Watson is not an innocent holder of the note. We are entirely satisfied that Dunlavy signed the note; that is, that the signature is in his handwriting. This was almost conceded by counsel for defendants on the argument. But the evidence leaves it clear enough. This fact goes far towards proving the good faith of the transaction. Dunlavy's reputation for integrity is not impugned. He appears always during his life to have had the entire confidence

of the society, and was trusted by it in its most important business affairs. There is no ground whatever shown for suspecting him. Nor is there any proof that the instrument is not such as was intended. It recites that the consideration for which it was given was in fact received. There is affirmative proof from witnesses that the money represented by the note was paid, and there is no proof to the contrary. The law presumes good faith and fair dealing. There is nothing but the singularity of the transaction to raise a suspicion of anything wrong, and this is not sufficient to overcome the positive evidence supported by the legal presumption. It is not necessary, therefore, to determine whether Watson is a "bona fide holder," as that term is employed in the law of negotiable paper.

We think the decree of the court below is right, and it is accordingly affirmed.