**In re ALOISI, Anna Patricia, Debtor.**

**No. 00–03162–6J7.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Feb. 12, 2001.

---

Raymond J. Rotella, Orlando, FL, for debtor.

Mary Kogut Equels, Orlando, FL, for movant.

Leigh R. Meininger, Orlando, FL, Chapter 7 Trustee.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DONNA LEE WILLIAMS' MOTION FOR PARTIAL RELIEF FROM THE AUTOMATIC STAY AND OBJECTION TO EXEMPTION*

KAREN S. JENNEMANN, Bankruptcy Judge.

This case came on for hearing on August 24, 2000, on the Motion for Partial Relief from Automatic Stay (the "Motion") (Doc. No. 7) and the Objection to Exemption (the "Objection") (Doc. No. 12) filed by Donna Lee Williams (the "Movant"), Commissioner of Insurance for the State of Delaware, as receiver for National Heritage Life Insurance Company ("NHL"), and the Memorandum in Response (Doc. No. 17) filed by the debtor, Anna Patricia Aloisi (the "Debtor"). Both parties filed additional memoranda of law supporting their respective positions (Doc. Nos. 18 & 22). After reviewing the pleadings, hearing the arguments of counsel, and considering the evidence and applicable law, Movant's Objection is overruled, and the Motion is denied.

The relief sought by the Movant is straight forward. Movant seeks relief from the automatic stay to proceed with an action pending in the United States District Court for the Middle District of Florida (the "District Court Action") styled *Williams v. Anna Patricia Aloisi, et al.*, Case No. 98–69CV ORL 18B. In the District Court Action, Movant seeks a money judgment and a constructive trust on funds received by the Debtor in connection with the sale of a condominium located in Winter Park, Florida. The Debtor used a portion of these monies to buy her current home. As a result, the Movant filed her recent Objection seeking to impose an equitable lien on the Debtor's home. The underlying facts are somewhat more complicated and revolve around the liquidation of NHL and the role of the Debtor's former husband in the company's demise.

NHL was a large insurance company. Lambert Aloisi ("Aloisi"), the Debtor's former husband, was an officer of NHL and a senior manager of its operations. In connection with this role, he, together with other senior officers of NHL, apparently stole or improperly diverted substantial funds from NHL and related companies. Ultimately, the business failed. The Movant was appointed to liquidate NHL's assets and to maximize the recovery to NHL's abandoned policy holders. The Movant has obtained two judgments against Aloisi for his misconduct during his stint at NHL. The first judgment, dated May 13, 1997, was in favor of the Movant and against Aloisi in the amount of $55,756,727.51. (Debtor's Exhibit No. 3). A second judgment, dated August 25, 1999, similarly was entered in favor of the Movant and against Aloisi in the amount of $3 million (Doc. No. 22, Debtor's Exhibit D).

The Debtor married Aloisi in 1988. The marriage lasted approximately three and one-half years. A final divorce decree was entered on March 17, 1992. However, the parties took several years to divide the marital property between them. (Debtor's Exhibit No. 1). Ultimately, in 1995, the Debtor obtained a judgment against her

former husband for $1.5 million. Aloisi did everything in his power to stop the Debtor from collecting upon this judgment.

For example, unbeknownst to the Debtor, Aloisi had purchased a condominium located at 147 Interlachen Place, Unit 2, Winter Park, Florida (the "Winter Park Condo"). (Movant's Exhibit No. 30). The Debtor never had an ownership interest in the Winter Park Condo; nor was she ever listed as an obligor on any note or mortgage encumbering the condo. Indeed, Aloisi worked zealously to conceal the condo from the Debtor by engaging in a complex series of sham transactions.

Aloisi also used some of the funds he diverted from NHL to pay down the mortgage on the condo. He paid $472,667.56 to Barnett Bank ("Barnett") who held a mortgage encumbering the Winter Park Condo (the "Mortgage Paydown"). (Movant's Exhibit No. 30, p. 2). At the time of the payment, the Debtor did not know of the condo or participate in any way in Aloisi's decision to pay the mortgage due to Barnett. The Debtor had no active role with NHL or Aloisi's fraudulent scheme. Consequently, the Debtor had no knowledge of Aloisi's interest in the condominium or of the satisfaction of the condominium's mortgage with NHL related funds until long *after* the divorce was final, nor was she a participant in his wrongdoing.

When the Debtor eventually learned of the existence of the Winter Park Condo, she expended considerable time and money trying to collect on her $1.5 million judgment and to defeat Aloisi's schemes to frustrate her collection efforts. To understand the difficulties overcome by the Debtor, a short discussion of Aloisi's complex scheme to hide the condo from the Debtor is necessary. Aloisi transferred title to the condominium for no consideration to Justin McClelland ("McClelland"), Aloisi's private investigator, and McClel-

land's girlfriend, Jacqueline Gibson ("Gibson"). (Movant's Exhibit 30, pp. 2–3). In order to create the appearance of a legitimate, third-party purchase, Messrs. Aloisi and McClelland engaged in a series of wire transfers whereby McClelland and Gibson received monies from Aloisi. (Movant's Exhibit 30, p. 3). McClelland and Gibson then used Aloisi's money to "purchase" the condominium, creating the appearance that they used their own money. (Movant's Exhibit 30, p. 3). The sham sale of the condominium to McClelland and Gibson took place on September 28, 1994. (Movant's Exhibit 30, p. 3).

In order to obtain title to the condominium, the Debtor was forced to file supplemental proceedings in connection with her divorce proceedings to avoid the transfer. Eventually, on November 26, 1996, the Debtor succeeded in gaining title to the Winter Park Condo, after a long and arduous fight to undo the fraudulent transfers. The Debtor then sold the property to a disinterested purchaser for $405,000. The Debtor used a portion of the proceeds, $191,280.75, to purchase a home located at 1208 Chichester Street, Orlando, Florida, on April 8, 1998. The Debtor claims this home as exempt on her bankruptcy schedules pursuant to Art. X, § 4(a)(1) of the Florida Constitution.

Movant alleges that the proceeds from the Debtor's third-party sale of the Winter Park Condo rightfully belong to creditors of NHL because the original mortgage on the condominium, held by Barnett, was satisfied with funds Aloisi allegedly stole from NHL or a related company. The Movant has sued the Debtor in the District Court Action to recover the Mortgage Paydown. In the District Court Action, Movant seeks a money judgment against the Debtor and to impose a constructive trust on the proceeds obtained by the Debtor from the sale of the Winter Park

Condo. The Movant did not seek to recover the Debtor's home or to impose any type of equitable lien on the home in the District Court Action. Cross motions for summary judgment are now pending in that case.

On April 26, 2000, the Debtor filed this Chapter 7 bankruptcy case because she has no money to pay her attorneys to defend her in connection with the District Court Action. The Debtor also has amassed additional debts due to her inability to collect upon her divorce judgment against Aloisi, other than to obtain title to the Winter Park Condo. She lives on a small pension and monthly social security payments. She has no money above that necessary to pay her minimal living expenses and has only one asset, her home. The Debtor received a discharge of all of her debts on August 8, 2000. No party, including the Movant, objected to the entry of the discharge or to the dischargeability of any individual debt.

In this Chapter 7 bankruptcy case, the Movant now wants relief from the automatic stay to proceed with the litigation pending against the Debtor in the District Court Action. She also objects to the Debtor's claimed homestead exemption asserting the Movant is entitled to an equitable lien against the Debtor's home to the extent that any portion of the Mortgage Paydown allowed the Debtor to purchase her home.

■ *Movant is Not Entitled to Relief from the Automatic Stay.* In the Motion for Relief from Stay, Movant seeks to have the automatic stay lifted to allow the District Court to resolve the pending cross motions for summary judgment. As a general rule, the filing of a bankruptcy petition operates to stay litigation involving prepetition claims against a debtor. *See* 11 U.S.C. § 362(a)(1). However, the automatic stay can be lifted if an interested party demonstrates "cause." *See* 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code. *In re Robertson,* 244 B.R. 880, 882 (Bankr.N.D.Ga.2000). Therefore, the judiciary must determine "cause" by examining the totality of the circumstances in each particular case. *Robertson* at 882 *citing Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90 (3d Cir. 1997); *Trident Assoc. v. Metro. Life Ins. Co. (In re Trident Assoc.),* 52 F.3d 127, 131 (6th Cir.1995).

■ Courts have adopted a balancing test for determining whether to modify the automatic stay to permit a pending action to proceed in another forum. A court should balance the prejudice to the debtor against the hardship to the moving party if the stay remains in effect as well as consider the efficient use of judicial resources, the location of witnesses, documents, and other necessary parties. A court can examine whether a creditor has a probability of success on the merits of his case. *In re Salisbury,* 123 B.R. 913 (S.D.Ala.1990); *Murray Industries, Inc. v. Aristech Chemical Corporation (In re Murray Industries, Inc.)* 121 B.R. 635, 636–37 (Bankr. M.D.Fla.1990); *Int'l Bus. Mach. v. Fernstrom Storage and Van Co. (Matter of Fernstrom Storage and Van Co.),* 938 F.2d 731, 735 (7th Cir.1991) *(citations omitted).*

■ Here, the Debtor would suffer great prejudice if the District Court Action were allowed to proceed. The Debtor does not have any available funds to defend the District Court Action. She has minimal income, and no assets to liquidate. She simply cannot afford a lawyer. Due to her inability to mount a legal defense, she could lose her home.

Furthermore, Movant has not demonstrated any hardship that would result from the continuation of the automatic stay. In the District Court Action, the

Movant seeks a money judgment against the Debtor or the imposition of a constructive trust over cash proceeds obtained from the sale of the Winter Park Condo. As to these claims seeking monetary relief, the Debtor received a discharge on August 8, 2000. The Movant did not object to the entry of the discharge or file an adversary proceeding contending that any possible monetary liability due by the Debtor to the Movant was not subject to the discharge.

The effect of a Chapter 7 discharge is to release a debtor from "all debts that arose before the date of the order for relief... and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title." 11 U.S.C. § 727(b). As applied to this case, Bankruptcy Code Sections 727(a) and (b) release the Debtor from any judgment the District Court may award, even if the action were permitted to proceed. Therefore, nothing remains for the District Court to resolve. Any judgment awarded by the District Court is discharged.

If desired, Movant can file a proof of claim in this Court, although any recovery is unlikely. Any new issues arising between the parties can be resolved here. The Debtor simply has no money to defend the District Court Action, and it would be unjust and unfair to a debtor seeking a fresh start to return to litigating a claim that is already discharged. The Movant has failed to demonstrate sufficient cause to modify the automatic stay. The Motion for Relief from Stay is denied.

■ *Movant's Objection to Debtor's Claim of Homestead Exemption is Overruled.* The Movant also has filed an objec-tion contending that the Debtor is not entitled to claim her home as exempt. More specifically, the Movant argues that she is entitled to an equitable lien against the Debtor's home in the amount of the proceeds infused into the home that came from the sale of the Winter Park Condo, approximately $192,000. The Movant has failed to establish any basis for such an equitable lien.

■ An equitable lien can be generally characterized as an encumbrance upon property, enforceable through equitable subrogation. *Society of Shakers v. Watson,* 68 F. 730, 739 (6th Cir.1895). Rights enforced through equitable subrogation "cannot be larger or different" than a party's original rights. *See* Greta K. Kolcon *Common Law Equity Defeats Florida's Homestead Exemption,* 68–NOV Fla. B.J. 54, 56 (*citing* Williston on Contracts, § 1265 (3d ed.1967)); *U.S. v. Munsey Trust Co. of Washington, D.C.,* 332 U.S. 234, 242, 108 Ct.Cl. 765, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947) ("[I]t is elementary that one cannot acquire by subrogation what another whose rights he claims did not have."). Equitable subrogation allows an equitable lien holder to "step into the shoes" of the party paid with ill-gotten funds. These equitable rights apply only to those limited circumstances where fraudulently obtained proceeds were used to satisfy obligations to an original creditor "who could have availed himself of an exception to the homestead exemption." *Bank Leumi Trust Company of New York v. Lang,* 898 F.Supp. 883, 888 (S.D.Fla.1995).

■ In Florida, an equitable lien may be "founded upon two bases: (1) a written contract that indicates an intention to charge a particular property with a debt or obligation: or, (2) a declaration by a court out of general considerations of right or justice as applied to the particular circum-

stances of a case." *In re Tsiolas*, 236 B.R. 85, 88 (Bankr.M.D.Fla.1999) (*citing Jones v. Carpenter*, 90 Fla. 407, 413–14, 106 So. 127 (1925); *Ross v. Gerung*, 69 So.2d 650, 652 (Fla.1954)). In the instant case, the first basis for an equitable lien is inapposite. The Movant relies upon the second basis and the decision of the Florida Supreme Court in *Palm Beach Savings & Loan Assoc., F.S.A., et al. v. Fishbein*, 619 So.2d 267, 271 (Fla.1993) to support the imposition of an equitable lien against the Debtor's home.

In *Fishbein*, a husband forged his wife's signature on loan documents to refinance the mortgage on their home. *Fishbein* at 268. The wife was obligated on the original mortgage but had no knowledge of the second loan or the forgery. *Id.* The prior mortgage was satisfied with the proceeds of the fraudulently obtained loan. *Id.* The Fishbeins divorced, and the judge in the dissolution proceeding awarded the wife the homestead. *Id.* at 269. The wife argued she had no liability to repay the fraudulently obtained loan because she did not sign the note or mortgage. *Id.* In response, the bank argued that it should be subrogated to the rights of the prior mortgage holder who received the proceeds of the fraudulently obtained loan. *Id.* The subrogation rights were sought as an equitable lien encumbering the homestead property.

The Florida Supreme Court agreed with the bank and granted the bank extending the forged loan an equitable lien in the exact amount paid to the prior mortgage holders and for related real estate taxes reasoning that the wife was no worse off. *Id.* at 270–71. She was obligated on the

initial mortgage and for the taxes. *Id.* at 271. If the wife were relieved from paying the later loan, she would receive an undeserved windfall simply because her husband forged her signature on the second mortgage. *Id.*

The Florida Supreme Court relied upon equity and two older decisions in reaching their decision. *Id.* at 270 (*citing Sonneman v. Tuszynski*, 139 Fla. 824, 191 So. 18 (1939) (equitable lien imposed on homestead where plaintiff and defendant had oral agreement that plaintiff would leave her job to live with and perform domestic services for defendant and defendant would support and house plaintiff for the remainder of plaintiff's life, plaintiff relied on this agreement, plaintiff advanced money to defendant, plaintiff performed labor and services under the agreement that may have improved the value of the homestead, and, where homestead claimed was also an income producing tourist camp); *La Mar v. Lechlider*, 135 Fla. 703, 185 So. 833 (1939) (equitable lien imposed on homestead where plaintiffs advanced money for an addition to defendants' house with the agreement that plaintiffs would live in and receive an ownership interest in the house, and defendants breached agreement)). In granting the equitable lien, however, the *Fishbein* Court departed from an earlier decision in which the Court instructed that exceptions to Florida's homestead exemption be strictly construed. *See Butterworth v. Caggiano*, 605 So.2d 56, 60 (Fla.1992). A significant question exists regarding the limits of Florida's homestead exemption and the scope and breadth of a court's ability to fashion or impose an equitable lien.[1] Indeed, much of the case law that has

---

1. *See Havoco v. Hill*, 197 F.3d 1135, 1141–42, 1144 (11th Cir.1999) (providing comprehensive summary of Florida cases to illustrate divergence in approaches to Florida's homestead exemption, and certifying to Florida Supreme Court question of whether Article X, Section 4 of Florida's Constitution exempts a homestead acquired with non-exempt funds where the debtor's specific intent is to defraud creditors).

emerged governing exemptions and equitable liens appears counterintuitive. For instance, some courts have sanctioned the equitable lien to prevent unjust enrichment in cases involving *no* criminal activity, where other courts have relied on the homestead exemption to protect a home from forfeiture when the home was purchased with the proceeds of criminal activity.[2] Regardless of *Fishbein's* divergence and the diversity in opinions, however, *Fishbein, Sonneman,* and *La Mar* are all distinguishable from the instant case.

In *Fishbein,* the Court permitted the Bank to have an equitable lien on the wife's homestead because the Bank's funds were used to satisfy preexisting mortgages and taxes on the homestead for which the wife was already obligated. In this case, the Debtor was never obligated on the mortgage encumbering the Winter Park Condo. Indeed, she did not know Aloisi even owned the condo due to his extensive efforts to conceal this fact. Aloisi may have satisfied Barnett's mortgage on the Winter Park Condo with ill-gotten gains; however, the Debtor purchased her home with funds she received from the sale of the Winter Park Condo paid by an unrelated, disinterested third-party. Moreover, she received no funds tainted by her ex-husband's fraudulent conduct. She obtained title to the condominium only after incurring great expense in setting aside several fraudulent transfers. The Debtor's diligence and subsequent success as a judgment creditor cannot be characterized as a windfall.

*Sonneman* and *La Mar* are distinguishable from the instant case. Both cases involve liens granted against homestead beyond the specific terms of Florida's constitution, however, the facts closely resembled exceptions to Florida's homestead exemption. Here, the facts bear no such similarity. In order to understand this distinction, a short discussion of Florida's exceptions to the homestead exemption is in order.

Article X Section § 4(a) of the Florida Constitution governs Florida homestead exemptions. Article X, Section § 4 provides in relevant part:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, **except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty,** the following property owned by a natural person:

(1) a homestead...

Fla. Const. art. X, § 4(a)(1) (*emphasis added*).

Florida law jealously protects residents' homestead rights. The purpose of the homestead exemption is to protect and shelter the family and to provide the family a refuge from "the stresses and strains of misfortune." *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992) (*citing Collins v. Collins,* 150 Fla. 374, 377, 7 So.2d 443, 444 (1942)). As a matter of public policy, the Florida homestead exemption should be liberally construed in favor of the party seeking the exemption. *In re Pettit,* 231 B.R. 101, 102 (Bankr.M.D.Fla.1999) (*citing In re Brown,* 165 B.R. 512, 514 (Bankr. M.D.Fla.1994)). A claimed homestead exemption enjoys a presumption of validity,

---

**2.** *Compare Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992) (prohibiting the civil or criminal forfeiture of homestead property); *Tramel v. Stewart,* 697 So.2d 821 (Fla.1997) (prohibiting criminal forfeiture of homestead property); *with Fishbein,* 619 So.2d 267, 271 (Fla. 1993) (imposing equitable lien to prevent unjust enrichment).

and the party challenging the exemption bears the burden of proving that the party claiming the exemption is not entitled to the exemption. *In re Pettit* at 102 (*citing In re Crump*, 2 B.R. 222, 223 (Bankr. S.D.Fla.1980)). Therefore, homestead is protected from *all* creditor claims unless the claim arises from real estate taxes or the purchase and improvement of the homestead property.

In *Sonneman*, the defendant's obligations arose under an agreement with plaintiff and appear close to falling within the scope of the exceptions to the homestead exemption for "obligations contracted for house, field or other labor performed on the realty" or for "obligations contracted for the purchase, improvement or repair" of the homestead. Fla. Const. art. X, § 4(a)(1). Similarly, in *La Mar*, defendants' obligation, resulting from the breach of an agreement with plaintiff also bore a strong resemblance to the exception to the homestead exemption for "obligations contracted for the purchase, improvement or repair" of the homestead. *Id.* In the instant case, however, there are no close factual calls. Here, no facts exist that could possibly justify Movant's employment of any of Florida's three constitutional exceptions to the homestead exemption.

Moreover, rights enforced through equitable subrogation or an equitable lien must be the same as whatever rights were originally held. 332 U.S. at 242, 67 S.Ct. 1599. In this case, the only original creditor who could have availed itself of an exception to the homestead exemption is Barnett because: 1) Barnett was the party allegedly paid with the proceeds of fraud; and 2) Barnett provided the original financing for the purchase of the Winter Park Condo. *See* Fla. Const. art. X, § 4(a). Therefore, the only rights Movant could subrogate are the rights of Barnett, rights that were

exercised approximately seven years ago. Movant cannot now "trace" the funds used to purchase the Debtor's homestead back through judgment awards and a series of transfers in hopes that an equitable lien will be imposed on the Debtor's new home because any "right" resulting from the tracing would be different than Barnett's original right, the mortgage lien on the Winter Park Condo. Therefore, Movant's request for an equitable lien is denied.

In this case, the Debtor has not been unjustly enriched. Rather, the Debtor and the Movant stand in similar positions with respect to Mr. Aloisi; both were victims of Mr. Aloisi's actions and fraud and both have taken legal action as a result. Essentially, the parties are competing creditors. The Debtor's diligence should not cause her to lose her last remaining asset simply because another creditor did not act as quickly. The Movant has failed to demonstrate any reason why she is entitled to an equitable lien on the Debtor's home or why the Debtor is not entitled to claim the home as exempt. The Objection is overruled.

*Conclusion.* The Motion for Partial Relief from Automatic Stay (Doc. No. 7) is denied. The Objection to Exemption (Doc. No. 12) is overruled. The Movant's request for an equitable lien on the Debtor's home is denied. A separate order consistent with these findings of fact and conclusions of law shall be entered.