SOCIETY OF SHAKERS v. WATSON et al.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1896.)

No. 422.

1. BILL OF REVIEW—AFFIRMED DECREE—APPLICATION TO APPELLATE COURT.
   An application for leave to file a bill of review after the decree has been affirmed is properly made to the appellate court.

2. SAME—NEWLY-DISCOVERED EVIDENCE—IMPEACHING WITNESSES.
   The discovery of new evidence, or of new witnesses, impeaching witnesses upon the original hearing, or for the purpose of showing subornation or perjury of such witnesses, is not generally regarded as a sufficient ground for allowing a bill of review. And this is especially the case where the credibility of the witnesses was directly put in issue at the original hearing.

3. SAME—CUMULATIVE EVIDENCE.
   Where the newly-discovered evidence does not consist of documents or other irrefragible evidence, but in the mere cumulation of witnesses to a fact once litigated, permission to file a bill of review should rarely be allowed. The new evidence, if cumulative merely, should be very clear, highly pertinent, and so well proven as to be controlling in its influence.

4. SAME—DISCOVERY OF BOOKS—NEGLIGENCE.

Failure to prove, at the original hearing, the loss of books, the contents of which were sought to be proved by secondary evidence, so that such evidence was excluded, *held* to be such gross negligence as would prevent the subsequent discovery of the books from being good ground for filing a bill of review, though it be then shown that the books were in fact lost at the time of the original hearing.

5. SAME—EFFECT OF NEW EVIDENCE.

Leave to file a bill of review will be denied when the effect of the newly-discovered evidence is at most merely to increase an existing doubt as to the real truth of the matter in issue.

Petition for Leave to File a Bill of Review.

Stone & Sudduth, P. B. Thompson, Sr., and Humphrey & Davie, for petitioners.

St. Geo. R. Fitzhugh and C. A. Hardin, for respondents.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge. This is an application for leave to file a bill of review upon the ground of newly-discovered evidence. The original decree was pronounced by the circuit court for the district of Kentucky in June, 1894. Upon an appeal to this court, this decree was affirmed, June, 1895. A petition to rehear was filed, and, upon consideration, denied. A petition was then filed in the supreme court praying that court to take the case upon a writ of certiorari. This, too, was denied in April, 1896. The case was remanded by this court to the circuit court with directions that its decree be affirmed and executed. The opinion of this court is reported in 68 Fed., at page 730, and in 15 C. C. A., at page 632.

As this is but a continuation of that case, we shall take it up from the point where that report left it. As the decree sought to be reviewed is in fact the decree of this court, the application for leave to file a bill of review is properly made here. Southard v. Russell, 16 How. 546; Kingsbury v. Buckner, 134 U. S. 650–671, 10 Sup. Ct. 638; Bank v. Taylor, 4 C. C. A. 55, 53 Fed. 854. On a mandate from this court, the circuit court can only record our decree, and proceed with its own decree as affirmed, or upon the decree it was directed to enter, and has no power to alter, rescind, or modify such decree, unless leave to do so is reserved, or first had and obtained by application to this court. The decrees and mandates of this court have precisely the same finality as the decrees and mandates of the supreme court. Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545.

The original bill was filed for the purpose of obtaining payment of a note in these words:

"(9,985.)                                           October 18, 1882.

"Seven years after date we promise to pay to the order of M. M. Mays or Barer the Some of Nine thousand Nine hundred and eighty- five-100 Dollars, value received, with interest at the rate of 6 per cent per annum from date until paid. Negotiable and payable at the 4 Natiol Bank cincinnati, if not paid when dew to Bring 8 per sent from date.                    Dunlavy & Scott.

"Trustees of the Society of Shakers at Pleasant Hill, Ky."

The ground upon which equitable jurisdiction was rested is fully discussed and decided in the opinion of this court heretofore cited, and need not be here referred to. This note, before maturity, was indorsed to Oliver Watson, and by the latter transferred as collateral security to Henry Souther. A number of defenses were interposed, all of which were considered both by this and the circuit court. Among these defenses heretofore litigated, and decided adversely to the petitioners, was the defense that the note did not represent a real transaction, and rested upon no consideration; that in fact M. M. Mays was an impecunious person, having no money to lend, and was wholly without credit or character; and that he had not in fact loaned the money represented by said note to said society or its trustees, nor to Dunlavy or Scott, officially or personally. Touching this defense this court said:

"We are entirely satisfied that Dunlavy signed the note; that is, that the signature is in his handwriting. This was almost conceded by counsel for defendants in the argument. But the evidence leaves it clear enough. This fact goes far towards proving the good faith of the transaction. Dunlavy's reputation for integrity is not impugned. He appears always, during his life, to have had the entire confidence of the society, and was trusted by it in its most important business affairs. There is no ground whatever shown for suspecting him. Nor is there any proof that the instrument is not such as was intended. It recites that the consideration for which it was given was in fact received. There is affirmative proof from witnesses that the money represented by the note was paid, and there is no proof to the contrary. The law presumes good faith and fair dealing. There is nothing but the singularity of the transaction to raise a suspicion of anything wrong, and this is not sufficient to overcome the positive evidence supported by the legal presumption. It is not necessary, therefore, to determine whether Watson is a 'bona fide holder,' as that term is employed in the law of negotiable paper. We think the decree of the court below is right, and it is accordingly affirmed." 15 C. C. A. 632, 68 Fed. 741, 742.

The newly-discovered evidence upon which petitioners seek to reopen said decree relates wholly to this question of the consideration for the note, or its fraudulent obtension by M. M. Mays, the payee. The business affairs of the Shaker Society were managed entirely by three trustees chosen by the community, who were general agents and trustees. At the date of the making of this note, October, 1882, these three trustees were B. B. Dunlavy, E. Scott, and Stephen Boisseau. Two of them, Dunlavy and Scott, died before suit was brought. The survivor, Stephen Boisseau, was a witness, and testified in the case, but has since died. The bill of review, which accompanies the petition for leave to file same, undertakes to state the newly-discovered evidence, and affidavits of the witnesses by whom this new evidence is to be made are filed with the bill of review as exhibits. The defendants have, by leave of court, filed certain counter affidavits. The points upon which new evidence is said to have been discovered are these:

First: It is said that the complainants in the original suit sought to establish that the note in suit had been executed for money loaned by said M. M. Mays by the testimony of Mary Myers and Fannie Owens, two married daughters of the payee, who did not himself testify, though living and competent as a witness. It is then charged that the testimony of said Mary Myers and Fannie Owens "was

fraudulent and perjured proof; that they had been suborned to testify by their father, M. M. Mays," and were induced or compelled by him to give their sworn depositions in that case, and swear that they had seen the money paid to B. B. Dunlavy by M. M. Mays at the time the note was executed. The discovery of new evidence, or of new witnesses, impeaching witnesses examined upon the original hearing, or for the purpose of showing subornation or perjury of such witnesses, is not generally regarded as a sufficient ground for allowing a bill of review. This was a point involved in Southard v. Russell, 16 How. 546–568. In that case it was sought to review the decree upon the ground that the successful party had suborned and bribed a principal witness, who had delivered important evidence in his favor. Justice Nelson, for the court, touching this ground for relief, said:

"Without expressing any opinion as to the influence this fact, if produced on the original hearing, might have had, it is sufficient to say that it does not come within any rule of chancery proceedings as laying a foundation, much less as evidence in support of a bill of review. The rule, as laid down by Chancellor Kent (Livingston v. Hubbs, 3 Johns. Ch. 124), is that newly-discovered evidence which goes to impeach the character of witnesses examined in the original suit, or the discovery of cumulative witnesses to a litigated fact, is not sufficient. It must be different, and of a very decided and controlling character. Brewer v. Bowman, 3 J. J. Marsh. 492; 6 Madd. 127; Story, Eq. Pl. § 413. The soundness of this rule is too apparent to require argument, for, if otherwise, there would scarcely be an end to litigation in chancery cases, and a temptation would be held out to tamper with witnesses for the purpose of supplying defects of proof in the original cause."

See, also, U. S. v. Throckmorton, 98 U. S. 66; Maddox v. Apperson, 14 Lea, 596; Barrett v. Belshe, 4 Bibb, 349; White v. Fussell, 1 Ves. & B. 151; Kimberly v. Arms, 40 Fed. 548.

Another objection is that upon the original trial the credibility of these witnesses, Mrs. Myers and Mrs. Owens, was put directly in issue. Evidence was then made of statements made by them to a Mrs. Young, inconsistent with their evidence. There was also evidence attacking their character for truth and veracity, chiefly based upon the influence of their father, as evidenced by their frequent appearance as witnesses in his behalf. Much of this testimony was incompetent, and much more was of slight importance, being for the most part deductions drawn by witnesses from insufficient data. Still, the veracity of these witnesses was a litigated fact, and the new evidence is in that respect cumulative in character, and rests upon no such solid basis as a conviction for perjury or the production of documents of unequivocal character. While there is no universal or absolute rule, as is said by the supreme court in Craig v. Smith, 100 U. S. 226, prohibiting the courts from allowing a bill of review upon the ground of newly-discovered evidence as to facts once in issue, still it is said, in the same case, that the allowance of leave to file such a bill upon that ground "is not a matter of right in the party, but of sound discretion to the court, to be exercised cautiously and sparingly." Where the new evidence does not consist in documents or records or other irrefragible evidence, but in the mere cumulation of witnesses to a fact once litigated, permission to file a bill of review should rarely be

allowed. The new evidence, if it be cumulative merely, should be very clear, highly pertinent, and so well proven as to be controlling in its influence. Craig v. Smith, 100 U. S. 226; U. S. v. Throckmorton, 98 U. S. 66; McDowell v. Morrell, 5 Lea, 278–283; Kimberly v. Arms, 40 Fed. 548; Livingston v. Hubbs, 3 Johns. Ch. 124; Taylor v. Sharp, 3 P. Wms. 371.

In U. S. v. Throckmorton, cited above, Justice Miller quotes approvingly from the case of Tovey v. Young, Finch, Prec. 193, where the lord keeper said:

"New matter may in some cases be ground for relief, but it must not be what was tried before; nor, when it consists in swearing only, will I ever grant a new trial, unless it appears by deeds or writing, or that a witness on whose testimony the verdict was given was convicted of perjury, or the jury attainted."

The evidence relied upon to support this charge of perjury is contained in the affidavit of one W. O. Mays, a brother of M. M. Mays, and an uncle of the two female witnesses he has voluntarily sought to impeach. The affidavit is indefinite. It deals in general statements as to conversations between M. M. Mays and his daughters as to what their evidence would be in this case. Its strength lies in conclusions drawn by the affiant, and is remarkably devoid of details. Certain counter affidavits have been filed by complainants which tend to show that no importance should be attached to the statement of the affiant. No explanation is made by petitioners as to how it comes that the uncle of the implicated witnesses should volunteer an affidavit intended to incriminate his own nieces in behalf of strangers, and in a lawsuit which does not affect him. Nothing tends to show that so surprising an affidavit is to be attributed to a general desire to subserve justice; on the contrary, it is rather to be ascribed to the hostile sentiments which the counter affidavits show him to entertain towards his brother.

Dunlavy died in 1886. He was the active trustee, and was the one with whom Mays had his dealings, and the maker of the note sued on. Whatever books were kept, showing financial transactions of the society, were kept by him. Petitioners now say that these books were lost or mislaid, and have only been discovered since the affirmance of the decree of the circuit court. They now exhibit these books, and aver that they contain no entry showing the borrowing of any such sum of money from Mays, or any one else, nor the execution of any such note. These books, especially the one called a "bills payable book," are more in the nature of loose memoranda than orderly business books. This evidence that these "books" show no evidence of such a transaction is of a negative character. That the debtor's books do not show a particular debt claimed may be some evidence that the debt does not exist. Its strength would depend upon other evidence as to the regular habit of the bookkeeper, his exactness, care, honesty, etc. We waive a consideration of the admissibility and weight of this proposed evidence, because we are of opinion that no case is made out which would justify the reopening of this decree upon this point. It was known on the trial that Dunlavy was dead, that he had kept books, and that his books had been carefully and correctly audited, after

his death, by an expert accountant. This accountant had been assisted by others, among them Boisseau, the surviving trustee. The deposition of this accountant, whose name was Gates, was taken, and he deposed that no trace of such a note or such a loan appeared on the books. This evidence was excluded because the books were the best evidence, and their absence was in no way accounted for. Petitioners now say that, in point of fact, most diligent effort was made to find and produce them, without result, and that they were only discovered in a most unusual place, long after final decree. If this proof now made as to the loss of these books had been made on the original trial, the secondary evidence as to their contents then offered would have been admissible. The petitioners were clearly guilty of negligence in not laying ground for the secondary evidence in their control as to the contents of these books. This is fatal to the present application, in so far as it rests upon the introduction of these books as newly-discovered evidence. They then knew of the existence of these books, and of their loss, and they knew that the books contained no record of this loan or the Mays note. Having thus been able to prove the existence of the books and their contents, by secondary evidence, their failure to lay ground for the secondary evidence is gross negligence, and no bill of review will lie to obtain the benefit of such proof after decree. 2 Beach, Mod. Eq. Prac. § 862.

Third. The next, and perhaps the principal, ground upon which this bill of review is predicated, is a charge that said M. M. Mays was intrusted with a blank note signed by Dunlavy and Scott, as trustees, for the purpose of borrowing money for the society from a social society known as the Society of Economists, located in Beaver county, Pa.; that, instead of so using the note, he filled it out payable to himself, and fraudulently indorsed it to Oliver Watson, who they now say is prosecuting this suit for the benefit of said Mays in his own name and that of Letitia Souther; and that this they can show by newly-discovered evidence. Upon the original trial the defendants denied all consideration for this note, and introduced much evidence tending to cast grave doubt upon the bona fides of the transaction. This defense necessarily included the theory now advanced. There was much evidence tending to show that M. M. Mays was an impecunious man, of doubtful character, much in debt, and of bad credit. The character of his daughters, by whom it was affirmatively shown that they saw the note signed and delivered, and the money paid over to Dunlavy, was also severely attacked. Contradictory statements made by them were also shown by one Mrs. Young. There was, however, no serious question as to the genuineness of the signature of Dunlavy, and it was also shown that he, for the society, both before and after this transaction, borrowed much money for the Shakers and in their name. No effort was made to cast discredit upon the character of Dunlavy, and there was no competent proof tending in any way to show that in fact this money had not been borrowed. The affidavits of many of the members of the society are now exhibited to show that they knew nothing of such a loan, nor of any necessity for such a sum

of money. Boisseau, one of the trustees, ought to have known most about this matter. Though examined as a witness upon the original trial, he was ominously not interrogated about this matter. Petitioners now say that he has since died, and cannot now be heard to say what he knew of this transaction. His silence, the absence of the trustees' books kept by Dunlavy, and the absence of all evidence from other members of the society, was impressive. The effort to now introduce the books of Dunlavy, and the evidence of members of the society who could and should have spoken upon the original trial, is not admissible under the facts of this case, after final decree. The ordinance of Lord Bacon, made to define the right of filing a bill of review, and regulate its exercise, prescribe i that no such bill "should be admitted on any new proof which might have been used when the decree was made." This ordinance Lord Eldon said, on the authority of Lord Hardwicke, had not been departed from. Young v. Keighly, 16 Ves. 348. It is not now averred that complainants have discovered any direct evidence assailing the consideration of this note, or supporting the very broad charge that the note was intrusted to Mays as the agent of the society to use in borrowing money, and that it had been misappropriated, or that the complainants are not in fact the holders of the note for value. The evidence which they say is newly discovered, and on which they rely to support this charge, is of more than doubtful value. First, they say that they have lately discovered a certain memorandum book, which they call a "letter register," which was kept by Dunlavy, and which covers the period from August, 1882, to July, 1886, the time of his death; that in that register are found memoranda made by Dunlavy of certain letters, purporting to have been written to Mays, and one to a certain Henritza, then president of the Economite Society in Beaver county, Pa. The first memorandum is dated November 2, 1882, of a letter written to Mays, and describes its contents only by saying, "About a loan." The second, to same, is dated November 8, 1882, and says, "Go to Economites for a loan." The third, to same, is dated November 21, 1882, and the memorandum says, "Report progress." The fourth entry is of a letter written to Henritza, the memorandum saying, "For a loan." The next entry is dated December 5, 1882, of a letter to Mays, requesting an answer about a loan. December 15, 1882, a letter to Mays is noted, asking him, "Try other parties about a loan." January 1, 1883, memorandum of a letter to Mays asking him to "report progress." April 23, a further letter to Mays saying, "Well supplied, but try for five or six per cent." September 5, 1883, a memorandum of another letter to Mays, asking "if loan could be effected." They say that, in addition to this letter register indicating contents of letters written by Dunlavy to Mays, they have also discovered a letter written by complainant Oliver Watson, to one H. L. Eads, under date of September 14, 1889. They say that Eads was a Shaker belonging to another community, who visited the society of the defendants in September, 1889, after Watson had informed them of the existence of the note in issue. This letter of Watson's is evidently in response to one from Eads in regard to

this note. Petitioners say that this letter was never communicated to them, and was accidentally discovered in an unusual place in the room occupied by Eads when staying at their village. That letter is in these words:

"New York, U. S. A., September 14, 1889.

"H. L. Eads, Esq.—Dear Sir: Yours of the 11th to me at New York forwarded to me at Fredericksburg, Va., from where I am now writing, although I am about leaving for New York. Mr. M. M. Mays, now living at Fredericksburg, Va., showed me several letters from Messrs. Dunlavy & Scott to him, in substance as follows: The Shaker community, in 1882 or 1883, owed some money, and desired to concentrate these debts, as well as to erect some kind of a manufactory; my recollection is, for making brooms. The trustees wrote Mays, who was acquainted with the Zoarites and Economites, to call upon these parties, and arrange, if possible, for the loan. Mays has also letters in answer from Mr. Henritza, declining. Were it not that the relations between Mays and myself are a little strained at present, I would obtain copies of letters, but, if you write him at address given, you will no doubt receive them. The young man whom you saw in New York wrote me you had called, but, owing to my being absent on my summer vacation, I did not receive his letter until a day or two ago, and, as I have had much trouble with my eyes, have avoided writing more than what was imperative. The note of $9,-985 and seven years' interest, I understand, has been forwarded to the bank in Cincinnati, where it is payable, for collection. Trusting this will be satisfactory I beg to remain

"Yours, truly,                                   Oliver Watson."

Petitioners further say that upon one occasion, while taking proof at Harrodsburg, Ky., for use in the original suit, St. George R. Fitzhugh, the leading counsel for complainants, "had in his possession several papers purporting to have been signed by B. B. Dunlavy, and showed simply the signatures of said papers to one Poteet, who informed one of the members of the society who was present * * * that he had seen certain papers in Fitzhugh's hands, but did not know what they were; that he had simply seen the signatures." The bill then proceeds by saying that counsel for defendants thereupon "called upon Fitzhugh to produce the papers," and that Fitzhugh produced a letter dated December 4, 1882, written by Dunlavy to Henritza, president of the Economite Society, and said that that was the only paper he had relating to the subject of controversy in said action. As a conclusion from all the newly-discovered evidence that has been stated, the bill of review then concludes by saying:

"Complainants aver that since finding the letter register, and the discovery of the letter from the defendant Oliver Watson to H. L. Eads, they are satisfied, and charge the fact to be, that said St. George R. Fitzhugh, at the time of taking said proof, and while he was conducting said cause, had in his possession the letters referred to in the said letter register, and the letters referred to in the letter of said Oliver Watson to H. L. Eads; and they charge that said letters were received by said M. M. Mays, and would and did fully explain how said M. M. Mays came into the possession of said note, and clearly conduced to show that it was given to him for the purpose of procuring a loan on behalf of said Society of Shakers at Pleasant Hill, Kentucky, from the Economites, and that he failed to procure said loan; and all of said letters were written after the note sued on bears date, and after the time when the two daughters of M. M. Mays testified that the money was paid and the note delivered, for the attention of the court is particularly called to that part of the testimony of these two women where they say that their father handed over to Dunlavy a large amount of money, and Dunlavy handed to their father a note. They state that at the time said proof was taken, and until the finding of said register and letter from Watson, they had no means of

knowing or suspecting what said papers were that were then in possession of said Fitzhugh as aforesaid; and they charge that these papers were improperly suppressed, and should all have been exhibited."

In support of this, the affidavit of Poteet is filed, averring that Fitzhugh showed him the signatures of said Dunlavy, attached to some five or six different "letters," which appeared to affiant, who was acquainted with Dunlavy's handwriting, to be letters written by Dunlavy. They also file several affidavits of counsel, and others present at the taking of proof on the occasion mentioned, showing that counsel for defendants then called upon said Fitzhugh to produce and file said letters so seen by Poteet, and that Fitzhugh did, after consulting with associate counsel, produce and file a letter of Dunlavy to Henritza of December 4, 1882, and declared that he had no other paper in his possession touching this matter. The actual truth as to the consideration for this note was not established to the entire satisfaction of this court upon the hearing of the appeal. The impecunious condition of Mays, which was well established, made the matter one of some singularity. That a man indebted as Mays was shown to be should have so large a sum to loan on so long a credit was peculiar. Still, it does not follow that a man refusing to pay his debts, and having no visible estate, may not have secret means, and might not, in order to secure it against creditors and make provision for the future, make just such a loan as the one in question. Certainly, the presumptions from the mere execution of the note were not overcome by mere evidence of the mysteriousness and singularity of the transaction. There was, in addition to this presumption, the affirmative evidence of Mrs. Myers and Mrs. Owens, already mentioned; and to this was added the testimony of one Bailey, who proved that in 1882 he was offered this note by Mays, and went to see the Shakers about it, to know if they were disposed to pay it before maturity. Bailey swore that he saw Scott, one of the trustees, who took him to one of the others, presumably Dunlavy, and that the latter said that the note had a number of years to run, and that they were not prepared to pay it before due. Although the character of Bailey and the two female witnesses was assailed, yet there was no affirmative evidence impeaching the genuineness or consideration for this note. Thus, the genuineness and the consideration of this note were facts in issue, and decided adversely to petitioners on the former trial. If the evidence now sought to be introduced is material at all, it is so only as tending to show that after the date of this note, December 18, 1882, B. B. Dunlavy was in correspondence with Mays about procuring for the society a loan of money, and also with one Henritza about the same thing. Neither the memoranda on Dunlavy's letter register nor Watson's letter to Eads contains any intimation that Mays had been intrusted with the note here in issue as an agent for negotiation, or with an unfilled note for that or any other purpose. The charges made so emphatically are a mere deduction from facts stated, which do not justify such a conclusion. The fact that Dunlavy and Mays were in correspondence about a loan, and that Mays was endeavoring to procure a loan for them, was fully

in evidence before. The letter register of Dunlavy under date of December 4, 1882, notes a letter to Henritza "for a loan." That letter was identified and filed by complainants on original hearing. In this letter, Mr. Dunlavy wrote, among other things, as follows:

"There was a gentleman here on business, from the neighborhood of Zoar, in Ohio, and in conversation with him we mentioned our intention of borrowing some funds to develop two new enterprises that were starting. A patent dump-wagon factory and the manufacture of Shakers' Aromatic Elixir of Malt, which required more ready capital than we could raise in short enough time from our regular income, provided we could obtain a loan at low rates of interest. This gentleman, M. M. Mays, remarked that Zoarites and Economites frequently had surplus funds to loan. * * * We would therefore be pleased to learn whether it would suit your convenience to supply us with any amount from $5,000 to $15,000, and the lowest interest at which you could place it. * * * Our friend Mays writes us that he applied to Zoar, and they informed him that they had placed all they had to spare a few days since, and would not have any more to spare till next April, when they could furnish $10,000. But it would be a great accommodation to us to receive it this side of Christmas."

"Dunlavy adds in a postscript: 'If necessary, I would visit your institution to fix up the papers, if you can furnish the accommodation, but it would be less trouble and expense to transact the business through the banks.'

"And as the brethren at Zoar referred our friend Mays to your people, giving your name and Lentz to address, we proposed to Mays to visit your place for the purpose, but do not know whether he has done so or not, as he has not reported, but would be pleased to know that he has, and the result. If not, would be pleased to receive an answer to the foregoing proposition."

The memoranda from the newly-discovered letter register evidences nothing more material than was shown by this letter. The Watson letter could add nothing. It contains no admissions more material than were abundantly established by the Henritza letter.

This brings us to the question of the Dunlavy letters charged to have been in the possession of Mr. Fitzhugh. The charge of the bill in this regard is supported alone by the Poteet affidavit. Mr. Fitzhugh, in a full affidavit, denies that he had or has any other letter written by Dunlavy than the one he filed on original trial. On this showing it would be most rank folly to reopen the case to get letters which he denies ever having had. But what evidence is there to show that, if other letters were in the hands of Mr. Fitzhugh, they contain any statement touching the execution of the note in suit? None whatever. Dunlavy's memoranda contains no intimation that he had ever intrusted Mays with such a note, or any note, to be made payable to the Economite Society, or any other person or society. How odd it is that he refers to no such matter in his letter to Henritza. What more natural, when telling Henritza of Mays' agency, to speak of his authority to fill up a blank note intrusted to him, especially as he refers to how the papers might be fixed up through the bank, or by a personal visit if necessary. The charge that this note was fraudulently filled up and misappropriated has no sort of support in any of the evidence which is set out as newly discovered. That Dunlavy should want more money after getting a loan from Mays may be a circumstance tending to show that he had not received from Mays the loan evidenced by this note; but that was a circumstance fully in evidence before. It by no means followed that he had obtained no money from Mays

in October, 1882, because in November, and for a year afterwards, he was endeavoring to borrow. The old record shows that Dunlavy was a borrowing man, and this new evidence only shows the same thing. The Henritza letter indicates that the loan which Mays had tried to get from the Zoarites and from the Economites was desired, not only to concentrate debts and to reduce rate of interest, but to engage in two new manufacturing enterprises. The inference that, because he wished Mays to secure this money, he had gotten no money from Mays personally, is altogether too remote. But we cannot pass by the Poteet affidavit without saying that, we accept Mr. Fitzhugh's explicit denial as entirely satisfactory. The hasty observation of a bunch of letters, "shuffled," as the affiant says, in the hands of Mr. Fitzhugh so as to exhibit Dunlavy's signature, might readily mislead Mr. Poteet into supposing all the letters to be letters of Dunlavy. If the defendants had reason to believe that Mr. Fitzhugh had possession of letters or documents which it was his duty to file as evidence, and that he was wrongfully suppressing evidence which the defendants were entitled to have, they should have sought a subpoena duces tecum, or applied to the court for an order on him to produce such letters. They did nothing of the kind. If they called upon him to produce them,— a fact which Mr. Fitzhugh denies,—they made no record of it, and suffered the matter to drop without bringing it to the attention of the court. Mr. Fitzhugh's denial that he was called on to file all such letters is rather borne out by the surprising fact that when he sought to identify the Henritza letter, and to file it in the record, the defendants are down on the record as objecting to the offered evidence. Why object if it was produced upon their call?

The charge that defendants have discovered that this suit is prosecuted for the benefit of M. M. Mays, and that he is furnishing the means to carry it on, is not supported by any statement of newly-discovered facts. The general charge is insufficient. The new facts should be fully set out which are relied on to make it good. It is, as a general charge, most emphatically denied in a counter affidavit by the counsel who has conducted the cause for the complainants from the beginning. The ownership of the note by Watson, and that he took same in exchange for a valuable estate in Virginia, was fully and satisfactorily made out upon the original hearing. This fact is unshaken by any newly-discovered facts stated in the bill. M. M. Mays is liable as an indorser. That he has any other interest in the case is not indicated by any circumstance in either the old or new record.

The circumstances that Mays was something of an adventurer, and was apparently insolvent, involved this transaction in some mystery. Mays has not testified, but complainants were not called upon to make him a witness. He might have been examined by the defendants if they had seen fit. The truth doubtless was that neither party trusted him. Yet he alone could tell from what source the money came which this note evidences as loaned by him to the Shakers. Doubtless, he had his own reasons for preferring to keep silent as to this. The evidence on the original trial, and that newly

discovered, leaves the transaction shrouded in more or less doubt. The presumptions arising from the genuineness of Dunlavy's signature and his unimpeached character were not overthrown by the mystery as to where Mays obtained the money to make such a loan. The new evidence, when the most that can be said for it is said, only serves to increase the doubt that must always exist as to the real truth of the matter. If we decide against the bill, as we feel constrained to do, it may result in fastening on the defendants an unjust debt. On the other hand, we are not persuaded that this new evidence, including that admissible for lack of due diligence in making it, is of such controlling weight as should under the rules of evidence operate to reverse the decree. So, too, we should not be unmindful of the evil of reopening a litigation once terminated. Lord Eldon, upon a petition of this kind, said of this consideration:

"It is most incumbent on the court to take care that the same subject shall not be put in a course of repeated litigation, and that, with a view to the termination of suit, the necessity of using reasonably active diligence in the first instance should be imposed upon parties. The court must not, therefore, be induced by any persuasion as to the fact that the plaintiff had originally a demand, which he could clearly have sustained, to break down rules established to prevent general mischief at the expense even of particular injury." Young v. Keighly, 16 Ves. 348, 349.

Upon a consideration of the whole case we are constrained to refuse our consent to the filing of this bill of review, though we do so with some misgivings as to the bona fides of the transaction as between the defendants and M. M. Mays. We have not meant, either in this or the former opinion, to intimate any opinion as to whether or not the complainants would be affected by a defense good as against M. M. Mays. That question was left undecided, and is still reserved. The costs incurred by this application will be paid by petitioners.