## CARSON v. AMERICAN SMELTING & REFINING CO.

(Circuit Court of Appeals, Ninth Circuit. March 1, 1926.)

No. 4304.

I. Patents ⚖52—To constitute anticipation, prior use must have been more than accidental or casual, and been established fact in the art, accessible to public.

Prior use, to constitute anticipation, must be something more than accidental or casual, and have been accessible to public, and an understood and established fact in the art.

2. Patents ⚖62.

Oral evidence to prove prior use must be clear and satisfactory.

3. Equity ⚖456—Petition for leave to apply below for permission to file bill of review is to be decided on showing by affidavits.

Whether appellee should have leave to apply to the court below to file bill of review must be decided on the showing made on the affidavits.

4. Equity ⚖447(2)—Unless new evidence would probably induce different conclusion, appellee will be denied leave to apply below to file bill of review.

Appellee will be denied permission to apply below to file bill of review, unless newly discovered evidence is so controlling that it would probably induce a different conclusion from that on which decree was based.

5. Equity ⬤➞447(2)—New evidence of prior use held not to warrant leave to apply below for bill of review, after reversal of decree for defendant in infringement suit.

New evidence of prior use, constituting anticipation of the invention on which patents for metallurgical furnaces were granted, *held* not such as to warrant leave to apply below for permission to file bill of review, after reversal of decree for defendant in infringement suit.

In Equity. Suit by George Campbell Carson against the American Smelting & Refining Company. Decree for defendant was reversed. 4 F. (2d) 463. On petition for leave to apply to District Court to file petition reopening cause, etc. Petition denied.

See, also, 11 F.(2d) 764.

John H. Miller, of San Francisco, Cal. (A. W. Boyken and Chas. S. Wheeler, Jr., both of San Francisco, Cal., of counsel), for appellant.

John C. Higgins, of Seattle, Wash., and John A. Shackleford, of Tacoma, Wash. (George Donworth, of Seattle, Wash., Frederick P. Fish, of Boston, Mass., William K. White, of San Francisco, Cal., and Albert M. Austin, of New York City, of counsel), for appellee.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

GILBERT, Circuit Judge. The appellee presents a petition with supporting affidavits for leave to apply to the court below for permission to file a petition for an order reopening the case for rehearing and for amendment to the answer by setting forth prior use of the appellant's invention in three large reverberatory furnaces in the plant of the Lake Superior Smelting Company at Dollar Bay, Mich., during the years 1903 to 1906, inclusive. Passing by the question whether there is adequate showing of diligence to discover this alleged newly discovered evidence, we think the petition to this court should be denied on other grounds presently to be considered.

The affidavits on behalf of the respective parties as to the use of the appellant's invention by the Lake Superior Smelting Company at Dollar Bay, Mich., are contradictory. For the appellee, there is the affidavit of Conant, the superintendent of the smelting furnaces, that for a period of approximately two years, between 1903 and 1906, the smelting company operated at its plant three smelting furnaces known as 9, 10, and 11, each having holes in the roof "near the vertical side walls," and that the entire smelting charge was fed to the furnaces through side passages, so as to form an embankment along the side walls and render fettling unnecessary. Kitts, the master mechanic, made affidavit that the furnace was equipped with ten round hoppers, positioned to feed charges through the roof, and that for a period of approximately two years all the ore smelted was charged along the side walls, and no center charging was used, and no fettling was used.

The affidavit of Teefey, an operative at the furnaces, was to the effect that furnace No. 9, when originally built, was equipped with square hoppers, charging off center, and that later the furnace was changed from center charging to side charging by 10 charge holes located close to the side walls, and that furnaces Nos. 10 and 11 were constructed in a similar manner; that about June, 1905, both those furnaces were changed, so as to be operated partly by center charging and partly by side charging, and were so used until about the year 1911.

The affidavit of Valliere, the head brick mason in charge of the construction of furnaces 9, 10, and 11, was in substance that furnace No. 9 was first constructed with hoppers for center feeding, but that new hoppers for side feeding were subsequently installed; that furnace No. 10 was constructed with openings for side charging, as well as openings nearer the center, but the four charge holes nearest the center were subsequently closed; that in the operation of furnace No. 8 prior to 1903 fettling material was fed through the holes in the two sides of the roof along the side walls, and that the material used was sand which came from the shores of Lake Superior; that thereafter no fettling was required.

Liebtrau, a brick layer foreman at the plant, made affidavit that in 1905 furnace No. 9 had ten round iron hoppers, five on each side, for side charging, and that the same was true of furnace No. 10 and furnace No. 11. Of similar import is the affidavit of Moehrke, machinist, as was also the affidavit of Greene, brick mason, and Roy, workman, and Morency, brick mason helper, and Varden, workman.

Seven other operatives at the plant made affidavits all to the effect that the ore was fed to the furnaces through openings near the side walls thereof, and that there was no center feeding, all of which was explained at length, and the majority of them made affidavit briefly and in identical phrase that "no fettling was necessary and no fettling was done." A minority of them made no mention whatever of the subject of fettling.

For the appellant there was the affidavit of Treglown that he was employed continuously at the Dollar Bay plant from 1887 to 1919, with the exception of 11 months beginning May 30, 1904, and ending April, 1905, during which time he was foreman at a smelting plant a few miles distant therefrom; that during his employment at the Dollar Bay plant his duties were to charge the furnaces with mineral, to skim off the slag, to tap the smelted copper into the refining furnaces, and to sand the furnaces when empty, in order to protect the inside walls; that the method was to dump the mineral into hoppers located above the roof and over the rear half of the furnace; that the mineral was let down through a number of charging holes in the furnace roof, and distributed on the furnace floor; that at intervals of three or four days the furnaces were emptied of melted copper, and sand was thrown in against the side walls and bridge, in order to protect the fire brick lining against being cut by the melted copper and slag; that the sand was thrown through the side doors by shovels and against the opposite wall; that some sand was put in through the skim hole at the front of the furnace and was by paddles placed against the side walls; that during the early operation of one of those furnaces some small holes were made in the roof along the bridge and sand was poured through these holes in order to protect the bridge, but that those holes were used only a few months as better results could be obtained with the paddles.

Said the affiant: "If we had left these furnaces go for more than a few days without resanding, the melted copper and slag would have cut into the brick walls, and the walls would have toppled over." He made a sketch of the plan of the roof, showing charging openings distributed over the surface thereof, but none placed so near to the side walls as to deposit a charge against those walls. The two charging holes nearest the front of the furnace, as shown in the sketch, were never used, he said, and were sealed up for the reason that the front of the furnace was so far from the fire box that it was difficult to melt the mineral fed through those holes, and that the hoppers that were inside the center line of the furnace were used every time the furnace was charged for the reason that the heat was greatest near the center and the mineral there melted more quickly, and he deposed that, when the mineral was fed through the charging openings, it formed cone-shaped piles on the floor of the furnace, the top of the cones being some distance from the inner walls of the furnace, and that they never

blocked up the side walls with mineral, but always left a channel at each side to let the slag flow along toward the front, and that the mineral was never fed into any of these furnaces directly against the side walls, as testified by Conant, the superintendent, but that it always formed cone-shaped piles from the different charging holes; that if such embankments of unmelted minerals had been maintained against the side walls they would have blocked the tap holes at the sides of the furnace at the bottom, so that melted copper could not have been drawn through them into the refining furnaces; that sand was always thrown against the wall by shovels from the side doors on the opposite sides of the furnace.

The affidavit of Des Roches was that he was surface foreman in charge of handling materials used in the smelting furnaces at the Dollar Bay plant, and that all the unloading of the mineral into the hoppers above the furnaces came under his supervision and direction, as also the hauling of the sand from the sand shed to the sides of the furnaces, where it was used to protect the inside of the furnace from cutting by the melted copper and slag. The substance of his affidavit is similar to that of Treglown. He said: "Sand was always used in the furnaces of this plant from the beginning of the operation during my time there (1898 to 1919). None of these furnaces was ever run while in normal operation for more than a few days, or possibly a week at a time, without the men putting new sand into them to protect the inside walls from the melted copper and slag. Before charging these furnaces with mineral, the sand was thrown by shovels from each side door to the inside of the opposite side wall, and also against the bridge at the rear. Some of it was put in through the skim hole at the front by means of long paddles. I remember that, just as soon as furnaces numbers 9, 10, and 11 were started, we used considerably more sand at the plant than formerly. As I was in charge of distributing this sand around to the different furnaces, I was, of course, in a position to know this."

The affidavit of Frank Fernette was that he was a workman at the plant from 1896 to April, 1905; that he loaded the hoppers of the furnaces 8, 9, and 10, and was familiar with the operation of furnace 11. His affidavit corroborated the others that, when the furnaces were in regular operation, fresh sand was thrown through the side doors against the opposite side walls at least once a week, if not oftener; that these furnaces were never charged in such a way that the

mineral formed an embankment against the side walls; that the mineral was entirely melted before tapping, and no embankments of mineral remained at the sides; that sand was always used between the mineral or melted copper and the inside walls of the furnaces to protect them.

The affidavit of William Fernette states that he entered into the employment of the Lake Superior Smelting Company at Dollar Bay in 1901 and worked there continuously until the spring of 1906; that he helped put mineral into the large furnaces known as 8, 9, and 10; that 9 and 10 were equipped with round sheet iron hoppers, arranged in several rows running lengthwise of the furnaces; that the two rows nearest the center line of the furnace were always used, from the time those furnaces were first equipped with round hoppers until he left the employment of the company; that the charging openings nearest the sides were at least two feet from the inside surface of the side walls; that many times he observed the sloping piles of mineral charged through those openings and that they did not pile up against the inner side walls; that the tops of those sloping piles were leveled off by means of a rabble inserted through the side door; that after the furnaces were charged with sufficient mineral the side doors and the charging openings were closed and the furnace was fired; that after the mineral was entirely melted the copper was drawn off through the tap holes at the sides of the furnace into the small refining furnaces; that the tap holes were level with the bottom of the inside of the furnace; that side walls and bottom of the bridge in these furnaces were always protected against cutting by the melted copper and slag by lake sand, which was pitched in from one side to the other through the side doors by shovels; that in some of the places, where it was hard to reach, the sand was put on paddles and placed against the walls; that when the large furnaces were used as smelting furnaces none of them was ever operated for more than three or four days at a time, or at the most a week, without being resanded along the side walls and the bottom of the bridge, "and this required considerable sand." "This practice of sanding the furnaces was never departed from at any time on any of these furnaces while I was employed at the Dollar Bay plant."

Kahler deposed that he was in the employment of the Smelting Company at Dollar Bay from 1899 to 1919; that his duties were to help in the running of the furnaces, comprising the operation of sanding the same; that in preparing furnaces 10 and 11 to receive a new batch of minerals a coating of sand was always provided along the side walls; that it was thrown in through the side doors and the skimming hole at the front end with shovels and a long paddle. "This sand was always provided to protect the walls from being eaten and pitted by the action of the hot slag and copper. This method was used in running all the furnaces in this plant during the time I was there, and these furnaces were always sanded before each batch to protect the walls."

Nye made affidavit that he entered the employment of the Smelting Company at Dollar Bay in 1891; that furnaces 9, 10, and 11 were used until about the middle of 1905 only for smelting copper ore or mineral; that after about the middle of 1905 they were used both for smelting and refining; that, while they were being used for smelting only, he often worked on furnace No. 10, and watched its operation daily; that the regular practice was, after the molten copper was drawn off from the furnace, to line the interior of it at the juncture of the floor and side walls with sand; that he was usually given the job of wheeling sand in the wheelbarrow from a nearby pile to the furnace, that this sanding of the interior of the furnace was a regular practice on No. 10, and that he saw it regularly done on furnaces 9 and 11. Referring to the claim that furnaces 9, 10, and 11 were operated continuously without sand or fettling material, he deposed: "I know of my own knowledge, due to my daily working around these furnaces and observing their operations, that such is not the fact. The practice of sanding the interior of these furnaces to protect them from the action of hot slag and copper was always carried on at the Dollar Bay plant of the Lake Superior Smelting Company, while I was there."

Grahel made affidavit that he was employed continuously as a smelter and refiner of copper ore at the Dollar Bay plant from 1890 until 1919, and worked as a runner of the furnaces; that in all of the large furnaces they always threw the sand through each side door on the floor, against the inside of the opposite wall, and if the distance from the door was too far the sand was placed by means of a sheet metal paddle held on the end of a long handle made of iron pipe; that on furnace No. 10 charging holes had been put in the roof near the center, and a few more holes had been added outside of the center holes, so that the charge was distributed more evenly on the bottom of the furnaces than when it was dumped in a heap through the holes in the center. "The result was that the

charge in the center of the furnace melted first, and we found, when we went to tap the furnace, that some of the charge at the sides had not completely melted, so that we had great trouble in getting the melted copper to run out through the tap holes at the side of the furnace. This unmelted charge plugged up the tapping hole, so that we had to use steel bars to try to open it up. * * * We always used sand to protect the inside walls of all the furnaces at the Dollar Bay plant all the time I was there. We never smelted or refined copper in any of these furnaces at any time without using sand between the mineral and the inside wall, to keep the hot copper and slag from cutting and eating into the walls of the furnace."

Mailhot made affidavit that during the year 1903 he entered the employment of the smelting company at Dollar Bay and worked for a few years; that it was always the custom to provide a coating of sand along the floor of the furnace, where it joins with the side walls, to protect the side of the furnace from being eaten by hot copper and slag; that he never heard of any of these smelting furnaces being operated without providing such a coating of sand for protection. "It was our custom, while I was working on the large furnaces, to provide a fresh coating each time a new charge was put in the furnace, save that occasionally, if the sand was in good condition, we would let it go for another batch without sanding."

Boatman made affidavit that he was in the employment of the Smelting Company at Dollar Bay from 1890 to 1919; that he worked on furnaces 9, 10, and 11 during the period when they were used for smelting only, and helped in the various operations. "It was our custom at all times on the large furnaces, as well as the small furnaces, to provide a coating of sand along the side walls at their juncture with the floor, to protect the walls from being pitted and scored by the action of the hot copper and slag."

Harvey made affidavit that he worked for the smelting company at Dollar Bay from 1899 to 1910; that he ran No. 9 furnace for about a year, and thereafter ran No. 10; that all of the furnaces used sand for the protection of the side walls; that where smelting was done sand was thrown in every three or four days. To the same effect, in substance, are the affidavits of Jandron and Ryan.

In reply to the affidavits of the appellant, the appellee produced affidavits of several affiants, denying the use of sand for fettling in the furnaces 9, 10, and 11, and affidavits of several of those who had signed affidavits for the appellant, repudiating to some extent the statements which they had formerly made. In the main, the substance of their new affidavits relates to the position of the hoppers and the method of feeding the ore. Ryan, in his new affidavit, deposed that "no fettling or sanding was required, and none was done," and Harvey stated that sand was not used for fettling in furnaces 10 and 11. Treglown, in his new affidavit, stated that the charging material formed sloping embankments resting upon the floors or hearths and along the vertical side walls of the furnaces, but he made no retraction of his former affidavit as to the use of sand for fettling. The same is true of Nye's and Kahler's second affidavits.

The workmen who made affidavits for the appellant appear to have been disinterested. They had been in close touch with the operation of furnaces 9, 10 and 11. Their original affidavits are all to the effect that fettling was continuously used in the furnaces during the very period when it is claimed that the appellant's invention was in use there. Corroborating them to some extent is the record proof of the large quantities of sand purchased by the Lake Superior Smelting Company for use at Dollar Bay during that period. The affidavits so submitted, together with the accompanying circumstances, create the strong impression that during the brief period so referred to there were in use at the plant of the Lake Superior Smelting Company, at Dollar Bay, three furnaces in the construction of which a change had been made from the prevailing type, in that the ore, instead of being fed through center openings of the roof, was introduced through the openings near the side walls, but that at the same time fettling continued to be used as theretofore, and that there was no thought of dispensing with fettling, and no discovery of the fact that its use could be obviated, and that the evidence now produced that no fettling was done is inspired by the after-discovered fact that "no fettling was necessary."

[1, 2] But, if the application here rested alone upon the affidavits presented by the appellee, the showing would be insufficient to establish prior use of the invention so as to defeat the patent. In Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504, it was held that the prior use must be so far understood and practiced or persisted in as to become an established fact, accessible to the public and contributing definitely to the sum of knowledge. In Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 F. 409, 416, it was said: "It is incumbent on the defendants, therefore, to show

that the prior use which is set up was so far appreciated at the time, and adopted or followed, as to create a well-understood, if not an established, practice, capable at any time of being resorted to, and not something incidental, indefinite, and fugitive, which is now hunted up and brought forward simply for the purpose of defeating the patent." In Anthracite Separator Co. v. Pollock (C. C.) 175 F. 108, 111, it was held that prior use, in order to negative novelty, must be something more than an accidental or casual one; that the use must have been accessible to the public and an established fact in the art. It is well settled that the oral testimony of many witnesses, if unsupported by any evidence consisting of documents or things, must be very reasonable or very strong to establish the defense of prior use. The Barbed Wire Patent, 12 S. Ct. 450, 143 U. S. 275, 36 L. Ed. 161; Deering v. Winona Harvester Works, 15 S. Ct. 118, 155 U. S. 286, 39 L. Ed. 153.

In the Barbed Wire Patent Case Mr. Justice Brown said: "The frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer." In Eibel Process Co. v. Minnesota & Ontario Paper Co., 43 S. Ct. 322, 327, 261 U. S. 45, 60 (67 L. Ed. 523), Mr. Chief Justice Taft said: "The temptation to remember in such cases, and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory." In Kalamazoo Loose Leaf Binder Co. v. Wilson Jones L. L. Co. (D. C.) 286 F. 715, 717, Judge Hand said: "I think the proof scarcely comes up to the severe standard imposed in such cases. There is no documentary corroboration of it, and the testimony of the witnesses, though unimpeached, is not supported by any circumstances which put it beyond the inevitable infirmities of their recollection. The most recent declaration of the Supreme Court, in Symington v. Nat. Castings Co., 39 S. Ct. 542, 250 U. S. 383, 63 L. Ed. 1045, shows no disposition to relax the well-established canon."

[3-5] The question whether or not the appellee should have leave to apply to the court below for permission to file a bill of review must be decided upon the showing made upon the affidavits (Suhor v. Gooch, 248 F. 870, 160 C. C. A. 628), and permission in such a case will be denied, unless the evidence is so controlling that it would probably induce a different conclusion from that on which the decree was based. Jourolmon v. Ewing, 85 F. 103, 29 C. C. A. 41; Society of Shakers v. Watson, 77 F. 512, 23 C. C. A. 263; Novelty Tufting Mach. Co. v. Buser, 158 F. 83, 85 C. C. A. 413, 14 Ann. Cas. 192; Kissinger-Ison Co. v. Bradford Belting Co., 123 F. 91, 59 C. C. A. 221. In Eclipse Mach. Co. v. Harley-Davidson Motor Co. (C. C. A.) 286 F. 68, it was held that the application must show that the evidence is of a character sufficiently decisive on the merits to move the court in its decretion. Judge Woolley said: "Applications of this kind, involving not infrequently belated attempts to escape the consequences of adverse decisions, are not favored by courts and are, accordingly, subjected to the closest scrutiny." In Providence Rubber Co. v. Goodyear, 9 Wall. 805, 19 L. Ed. 828, it was held that a bill of review will not be granted where the court is satisfied that upon the case offered to be made out the decree ought to be the same as has been already given. Said the court: All "the affidavits have failed to satisfy us, that if a bill of review were filed the result would affect the decree which has been rendered." In Bresnahan v. Tripp Giant Leveller Co., 99 F. 280, 284, 39 C. C. A. 508, 511, it was said: "The decisions (and there are many) all go at least to the extent of saying that the new evidence, to warrant it, must be so cogent and persuasive as to impress the court with the conviction that, if it had been presented and considered on the original hearing, it would have clearly produced a contrary conclusion from the one there reached."

The evidence in support of the present application is oral. It is not supported by any physical object or by documentary proof. The documentary evidence of blueprints or plans for the construction of the furnaces which has been adduced is not at all incompatible with the appellant's affidavits concerning the actual method of operating and fettling the furnaces by the workmen who had charge of them. There is nothing in the proof offered by the appellee to show that any person other than the appellant ever conceived the idea of dispensing with fettling by banking the ores against the furnace sides. If any other person conceived that idea his conception is not shown to have been made known to anyone, or in any way disclosed to the public as an improvement or otherwise. If the furnaces were in fact operated in the manner asserted by the appellee, it must have been done without any conception of the in-

ventive idea which underlies the patent. It is not even hinted that such operation was recognized as a discovery, or as a new operation or an improved operation, or as anything different from that which had gone before. It is not suggested that it was ever mentioned in the eight or nine metallurgical books on subjects such as "Copper Mines of Lake Superior," "Recent Copper Smelting at Lake Superior," etc., published at intervals between 1904 and 1914.

The application is denied.